**BELLSOUTH CORPORATION,**
Plaintiff,

v.

**WHITE DIRECTORY PUBLISHERS, INC., and White Directory of Carolina, Inc., Defendants.**

No. Civ. 1:97CV00897.

United States District Court,
M.D. North Carolina.

Jan. 20, 1999.

Daniel R. Taylor, Jr., Kilpatrick Stock-
ton, L.L.P., Winston–Salem, NC, Anthony

B. Askew, Jones and Askew, LLP, Atlanta, GA, for BellSouth Corporation, plaintiff.

Gilbert J. Andia, Jr., Rhodes, Coats & Bennett, L.L.P., Greensboro, NC, James Lee Lester, Rhodes, Coats & Bennett, L.L.P., Greensboro, NC, Paul I. Perlman, Kevin M. Kearney, Hodgson, Russ, Andrews, Woods, & Goodyear, LLP, Buffalo, NY, for White Directory Publishers, Inc., White Directory of the Carolina, Inc., defendants.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

## INTRODUCTION

This matter is before the court on a motion for summary judgment filed by. Defendants White Directory Publishers, Inc., and White Directory of Carolina, Inc. (collectively "White Directory"). This action arises out of Plaintiff BellSouth Corporation's ("BellSouth") claim that White Directory has infringed upon the "walking fingers" logo in areas where BellSouth provides local telephone service.[1] Bell-South asserts its claim of infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which affords protection to unregistered marks under certain circumstances, asserts a claim of dilution under Section 43(c) of the Lanham Act, and asserts claims under North Carolina statutory and common law. After completion of discovery, White Directory moved for summary judgment on the grounds that the history of AT & T's development and implementation of the symbol reveals that it is not a valid and protectible trademark. White Directory also argues that the equitable doctrines of laches, judicial estoppel, and res judicata bar BellSouth's action. For the following reasons, the court will grant White Directory's motion for summary judgment.

1. On January 1, 1984, AT & T was divested of the twenty-two Bell operating companies which provided local telephone service to discrete areas of the United States. BellSouth was formed on that same date as the holding company for two of the Bell operating compa-

## FACTS

The following facts are established in the pleadings, affidavits, deposition testimony, and exhibits offered by the parties. Where there are disputes, each party's position is given.

The nature of White Directory's summary judgment argument requires the court to examine in some detail the history of the development of the mark at issue here, the famous "walking fingers" logo. BellSouth contends in its complaint that it and its predecessors have used the three-fingered logo on their telephone directories since 1962 to signify to the public the source of these directories. Although neither AT & T nor BellSouth and its predecessors registered the mark, BellSouth maintains that its continuous use of the mark and the public's association of it with BellSouth warrant affording the mark protection under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). BellSouth has submitted to the court several surveys which it contends suggest that the public views the "walking fingers" logo as the brand identifier, as well as other evidence which it contends indicates that White Directory's use of the "walking fingers" creates confusion among advertisers and the general public as to the source of White Directory's product.

White Directory's basic defense to these allegations is that AT & T, after developing the "walking fingers" logo, announced it did not consider the logo to be a protectible interest, thereby disclaiming any proprietary rights it might have had in the logo and placing it in the public domain. White Directory has provided the court with affidavits of Edward Hancharik and Fred E. Smykla, formerly top-level officers of AT & T and the National Yellow

nies, Southern Bell Telephone ("Southern Bell") and South Central Bell Telephone ("South Central Bell"). In this opinion, the court will refer to Southern Bell and South Central Bell as "BellSouth's predecessors."

Pages Service Association, respectively, to recount the history of the logo's development and AT & T's representations regarding the status of the mark. White Directory also has presented evidence that numerous directories not associated with BellSouth have borne the "walking fingers," dating back to AT & T's creation of the mark, and that AT & T not only acquiesced in such use of the logo, but expressly approved of it and encouraged it as well. White Directory argues that by these actions AT & T established the logo's status as a product identifier for the yellow pages generally, rather than as a brand identifier for AT & T or any Bell System company. Such a designation would negate any claim of protection under trademark law asserted by BellSouth and would warrant summary judgment.

The story of the "walking fingers" begins in the 1960's. Edward Hancharik, who worked in AT & T's Directory Services Group from 1952 until 1972, when he became director in charge of all telephone directory services at AT & T, has provided in his affidavit a summary of the relevant historical events. The Directory Services Group did not publish telephone directories, a service performed by the various Bell operating companies, but rather coordinated and promoted use of yellow pages telephone directories (both Bell and non-Bell) across the nation. If use of yellow pages increased nationally AT & T-affiliated companies stood to benefit in terms of advertising dollars received by virtue of the large market share they commanded. To this end AT & T launched a television and print advertising campaign using the slogan "Find it Fast in the Yellow Pages"; with this slogan appeared a logo depicting a telephone over an open yellow pages book. According to Hancharik, "[a]dvertisers were given decals bearing this logo, and were encouraged to and did use the telephone-over-the-open-book logo on store fronts, trucks, and the like." Hancharik Aff., ¶ 4.

In the 1960's AT & T, with the help of an advertising firm, developed a new national slogan to promote yellow pages use, "Let Your Fingers Do the Walking in the Yellow Pages." A new logo appeared as well, which initially featured female fingers walking over a telephone directory. Within a few years the fingers were modified so as not to depict gender. The logo underwent minor modifications again in the 1970's, and by 1978 appeared in the form still used today. As with the previous symbol and slogan, the new "walking fingers" were used both by the Bell operating companies and by advertisers. AT & T also used the logo itself to advance general use of yellow pages. In the November 10, 1975, issue of *Time* magazine, for example, an AT & T advertisement appeared promoting yellow pages advertising. Hancharik Aff., Ex. A.

In addition to furthering use of the logo by the Bell operating companies, AT & T also encouraged independent telephone companies (*i.e.*, those other than the regional Bells) and independent directory publishers to use the logo on classified directories they produced. These non-Bell companies also used the symbol and slogan as part of their own advertising and promotional efforts, and encouraged their advertisers to display the logo. Thus the logo came to be used not only by advertisers appearing in Bell directories, but also by those appearing in directories of independent telephone companies and independent publishers not affiliated with telephone companies. According to Hancharik, "the walking fingers slogan was used extensively throughout the country as the symbol for the yellow pages." Hancharik Aff., ¶ 6. This conclusion is supported by a note appearing in a 1975 issue of Southern Bell's "Views" magazine. The note is headlined " 'Walking fingers' identify Yellow Pages," and begins " 'Let Your Fingers Do the Walking' has proven to be one of the best-known product identifications of all time." Perlman Aff., ¶ 69; Perlman Aff., Ex. 29 to Ex. K.

In light of this widespread use of the "walking fingers," the Bell operating companies inquired of AT & T whether the logo should be registered as a trademark. John Preston, general counsel of AT & T, Jerry Murphy and Robert Sanderford, also in-house attorneys with AT & T, and Hancharik met to discuss the matter. Hancharik Aff., ¶ 8. The group concluded that "because of extensive third party use, both by advertisers and by non-AT & T publishers, the walking fingers symbol already was in the public domain." *Id.* The group resolved "not to seek any proprietary rights in the symbol, but to continue to encourage use of the walking fingers by advertisers and publishers." *Id.* Hancharik relayed the group's determination to the Bell operating companies, who concurred in the decision not to register the "walking fingers." *Id.* Thus both Southern Bell and South Central Bell were made aware both of AT & T's decision not to register the "walking fingers" logo and of the reasons for that decision. *Id.* at ¶ 10.

This meeting was not the last time the issue of registering the "walking fingers" was brought before AT & T by the Bell operating companies. While employed as director of AT & T's telephone directory services, Hancharik conducted semi-annual meetings attended by the regional Bells. According to Hancharik, in at least one of these meetings the issue of registering the "walking fingers" arose again. Hancharik Aff., ¶ 9. In response, Hancharik "explained to these representatives of the regional Bell publishers that AT & T and the Bell companies had decided not to seek proprietary rights in the walking fingers symbol, and that it was freely available for use by all directory companies." *Id.* On at least one occasion prior to divestiture but after these meetings, attorneys for Southern Bell informed a competing publisher that Southern Bell "does not separately claim exclusive rights ... in the 'walking fingers' symbol." Perlman Aff., Ex. E. During this period, Southern Bell took the same position in a copyright infringement suit against an independent Atlanta directory publisher. Perlman Aff., Exs. F & H.

As noted above, AT & T itself never published local telephone directories; this was the responsibility of the Bell operating companies. Instead, as Hancharik described, AT & T's role lay in developing a nationwide strategy to promote yellow pages use, a strategy of which the "Let Your Fingers Do the Walking" slogan and the "walking fingers" logo comprised an integral part. Another aspect of this effort included the creation of the national yellow page advertising system ("NYPS"), an organization which was begun in 1960 by Fred Smykla while an employee of AT & T. White Directory has submitted an affidavit of Smykla in which he describes the origins of this entity and its relationship to the "walking fingers" logo.

According to Smykla, NYPS was created to facilitate advertising in the yellow pages by national corporations. Smykla Aff., ¶ 3. NYPS enabled an advertiser such as General Motors to place advertisements in all Bell System yellow pages throughout the United States with a single contract. Before NYPS came into formation, under these circumstances General Motors was forced to contract individually with all publishers of the classified directories in which it wished to advertise. Although NYPS's founders initially contemplated membership only of Bell System publishers, in 1961 they expanded it to include all non-Bell telephone company publishers as well. AT & T chose to broaden the scope of NYPS to make it a more comprehensive advertising system. *Id.* at ¶ 4.

In November 1974, AT & T voluntarily divested itself of NYPS. Shortly thereafter, the former members of NYPS formed the National Yellow Pages Service Association ("NYPSA"). Smykla served as the executive director of NYPSA from April 1975 until his retirement on December 31, 1988. Following a merger in 1988, NYPSA became a division of the Yellow Pages Publishers Association, Inc. ("YPPA"). When NYPSA was formed it included

twenty-six publisher members, but its leaders chose to liberalize admission further and permitted independent directory publishers not affiliated with any telephone company to join. Membership grew to 183 members by 1986.

According to Smykla, even prior to NYPSA's formation, both the Bell System telephone companies and the independent telephone company publishers had been using the "walking fingers" logo. Smykla Aff., ¶ 6. In a meeting in 1975 attended by Smykla and Alan Waterstone, counsel for NYPSA, as well as Hancharik, Gary Garrison, and Robert Sanderford of AT & T, Smykla asked whether NYPSA needed a license to use the "walking fingers" on its materials. According to Smykla, Sanderford told him that such a license would not be necessary. *Id.* at ¶ 13. Sanderford explained that "because AT & T . . . wanted maximum publicity and use of the walking fingers logo, [it] never [had] sought trademark or other proprietary protection for it. [AT & T] considered the symbol available for use by the industry." *Id.* Hancharik supports Smykla's recollection of the meeting, stating that "Mr. Sanderford and I explained that no license was needed for the walking fingers, because in AT & T's view it was already in the public domain." Hancharik Aff., ¶ 11. According to Hancharik, Smykla also was informed that "the walking fingers symbol was available for use by any yellow pages publisher." *Id.*

In response to AT & T's representations at this meeting, NYPSA incorporated the "walking fingers" logo into its materials. For example, YPPA's 1988 membership roster bore the logo on its cover, as did the March 1987 Rates and Data Book. Smykla Aff., Exs. A & B. Furthermore, NYPSA/YPPA has displayed the logo prominently on many of its own advertisements. Smykla Aff., Ex. D. According to Hancharik, AT & T was aware of such use of the "walking fingers" by NYPSA and did not object. Hancharik Aff., ¶ 12.

NYPSA informed its members that the "walking fingers" logo was available for use by all after being told by Hancharik and Sanderford that AT & T claimed no rights in the symbol. Included as Exhibit C to Smykla's affidavit is an example of a letter from Smykla to an NYPSA member explaining that the "walking fingers" logo was freely available. Smykla's representations served only to confirm already existing understandings of the logo in the industry. According to Hancharik, use of the logo by non-AT & T publishers had begun "almost immediately after AT & T and Bell companies began their use of the walking fingers." Hancharik Aff., ¶ 13. AT & T was aware of such use "from the first" and did not object to it because it believed the symbol to be in the public domain. *Id.*

By the 1980's many publishers used the "walking fingers" logo on telephone directories. White Directory has presented evidence which demonstrates that in 1989 only twenty-two of some 6,200 yellow pages directories appearing across the nation did not display the "walking fingers" logo in some form. Granville Aff., Ex. A. Out of 1,118 directories from the nine states in which BellSouth provides some local telephone service, only four did not bear the symbol in some form. *Id.* Although by 1998 the percentage of directories using the "walking fingers" logo had diminished somewhat, still an overwhelming majority displayed the symbol. Of 5,600 yellow pages directories nationwide, only 11.1% did not use the "walking fingers" in some form. Murray Aff., ¶ 4. Out of 947 directories from the nine BellSouth states, some 925 used the "walking fingers," with 769 displaying the symbol on the front cover. *Id.* at ¶¶ 4–5.

White Directory is one of the many independent publishers using the "walking fingers" logo on its directories, and it has used the symbol for a number of years. The founder and first president of White Directory, Wilbur Lewis, submitted an affidavit in this action. According to Lewis,

White Directory became a member of NYPSA in 1975, the first year independent directory publishers such as White Directory were permitted to join. Wilbur Lewis Aff., ¶ 5. Lewis states that at a NYPSA meeting in 1975 Smykla informed the NYPSA members that AT & T claimed no rights in the "walking fingers" logo and that it was freely available for use, without geographic or time limitation. *Id.*, ¶¶ 6–7. In reliance on this information, White Directory has used the "walking fingers" logo on its directories since 1976. *Id.* at ¶ 8. White Directory received no objection to its use of the "walking fingers" from AT & T, BellSouth, or any Bell-affiliated company prior to 1997. *Id.*

In 1978, AT & T issued guidelines to all Bell System directory publishers defining appropriate use of the "walking fingers" logo. These guidelines refer to the logo as "the Yellow Pages identification mark" and direct the directory publishers to add to the text "yellow pages" accompanying the logo either the name of the particular Bell company or "Bell System" in bold type. Hancharik Aff., Ex. B. The guidelines explain that the inclusion of the Bell operating company's name will "create immediate viewer perception of Bell System sponsorship." *Id.* Hancharik echoes this explanation, stating that "[t]he purpose of emphasizing the name of the particular Bell System company which published the directory . . . was to identify the directory as a Bell System directory as differentiated from another company's directory." Hancharik Aff., ¶ 14. According to Hancharik, AT & T recognized that it was necessary to distinguish itself from other directory publishers with respect to use of the "walking fingers" logo because so many non-Bell-affiliated companies used the same symbol. *Id.*

On January 1, 1984, AT & T was divested of the Bell operating companies. On that date, BellSouth was established as the holding company for Southern Bell and South Central Bell. Prior to divestiture, Hancharik issued a bulletin to all Bell operating companies which explained the impact divestiture would have on directory issues. · Southern Bell, South Central Bell, and the other operating companies were informed that AT & T had agreed to assign the Bell logo to each Baby Bell. Hancharik Aff., ¶ 16. The Bell operating companies also were told, however, that the "walking fingers" logo and the "Let Your Fingers Do the Walking" slogan were in the public domain and remained free for use by any independent telephone company or independent directory publisher, and thus would not be assigned. *Id.* Hancharik recalls no objection from the regional Bells with respect to this pronouncement. *Id.*

Shortly after it was created, BellSouth formed BellSouth Advertising & Publishing Corporation ("BAPCO") to develop and publish BellSouth classified directories. BellSouth is certified to provide local telephone service to discrete areas in North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, Tennessee, and Kentucky (collectively "BellSouth territory"). In North Carolina, BellSouth territory includes Greensboro, Winston-Salem, Burlington, and Chapel Hill. BAPCO publishes classified directories for all BellSouth territory in North Carolina, as Southern Bell did prior to divestiture. Some thirty-two independent telephone companies provide local telephone service to North Carolinians living in non-BellSouth territory. Sometimes these BellSouth and non-BellSouth territories abut within a single metropolitan area. For example, North State Telephone Company ("North State") is certified to provide local telephone service in High Point, whereas Greensboro falls within BellSouth territory.

In this suit, BellSouth challenges White Directory's use of the "walking fingers" logo on directories encompassing BellSouth territory. BellSouth maintains that it never has objected to use of the "walking fingers" by independent telephone companies in their certificated areas (for

example, by North State in High Point). It has submitted evidence that since 1986 it has objected on several occasions to competitors' use of the "walking fingers" within BellSouth territory. Teilhaber Aff., Ex. 48. Initially, these objections were based on BellSouth's application for concurrent use registration of the "walking fingers" in BellSouth territory in 1985. This attempt failed in 1995 when the Federal Circuit affirmed summary judgment in favor of those opposing registration in *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565 (Fed.Cir.1995). The court denied BellSouth's application because it found the "walking fingers" to be generic in non-BellSouth territory and thus ineligible for concurrent use registration. Since its loss in 1995, BellSouth has continued to object to use of the "walking fingers" in BellSouth territory, now asserting that it has trademark rights in the "walking fingers" under the common law.

In 1995, White Directory first used the "walking fingers" logo in North Carolina on its Talking Phone Book for Greensboro/High Point, which appeared in 1995–96. This directory overlapped BellSouth territory and thus competed with BAPCO's BellSouth directory for Greensboro yellow pages advertising dollars.[2] White Directory has continued to use the logo in subsequent directories for Greensboro/High Point, as well as for Chapel Hill/Carrboro and Burlington/Alamance, all areas overlapping BellSouth territory. BellSouth notified White Directory on January 27, 1997, that it objected to White Directory's use of the "walking fingers," and commenced this non-jury action on August 25, 1997.

Following the completion of discovery, White Directory moved for summary judgment, arguing that there is no genuine issue of material fact as to whether Bell-South has a valid and protectible trademark interest in the "walking fingers." As

grounds for summary judgment it argues that AT & T's actions prior to 1984 placed the logo irretrievably in the public domain. BellSouth relies exclusively on consumer surveys to establish a genuine issue. Teilhaber Aff., Exs. 14 & 15; Nancy Searcy Edwards Aff., Exs. O & P; Donald E. Payne Aff. These surveys, it argues, suggest that the public understands the "walking fingers" logo to be a brand identifier for BellSouth and thus that it is eligible for trademark protection under Section 43(a) of the Lanham Act.

### DISCUSSION

Summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

A. *The "Walking Fingers" is not a Valid Trademark.*

1.

White Directory argues that BellSouth's infringement claims cannot succeed because BellSouth cannot demonstrate that it has a protectible trademark interest in the "walking fingers" logo. White Directory has supported its motion by presenting

---

**2.** BAPCO's BellSouth directories for the Greensboro area have included telephone numbers from non-BellSouth territory as well

as advertisements from businesses located in non-BellSouth territory.

evidence, uncontradicted in the record, that AT & T expressly disavowed any trademark interest it might have had in the "walking fingers" when it developed the symbol. White Directory also supports its motion with uncontested evidence that AT & T encouraged non-Bell system directory publishers to use the symbol in connection with their yellow pages directories and encouraged all advertisers to use the symbol in their own promotions. White Directory has presented evidence of the vast proliferation of the symbol through the yellow pages industry in response to AT & T's actions. Finally, White Directory has demonstrated that BellSouth's predecessors knew of these circumstances and in fact acted in a manner consistent with AT & T's policies regarding the mark. White Directory contends that this pattern of behavior by AT & T and BellSouth's predecessors placed the "walking fingers" irretrievably in the public domain and thereby precludes BellSouth from now asserting trademark rights in the logo. In response, BellSouth has submitted five consumer surveys which it argues create a genuine issue as to whether the "walking fingers" is a protectible trademark.

■ To prevail on a trademark infringement claim under Section 43(a) of the Lanham Act, a plaintiff must satisfy two general requirements. It must demonstrate (1) that it has a valid and protectible trademark and (2) that the defendant's use of the mark in question creates a likelihood of consumer confusion. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir.1995). If all doubt is resolved in BellSouth's favor, its surveys suggest that some relevant consumers are confused by White Directory's use of the "walking fingers." At this stage of litigation, however, White Directory does not contest this element of BellSouth's proof; White Directory argues instead that there is no genuine issue as to whether BellSouth has any trademark interest in the "walking fingers."

■ Although neither BellSouth nor any of its predecessors registered the "walking fingers" logo, Section 43(a) of the Lanham Act can provide protection for the symbol, if BellSouth demonstrates that it is a valid and protectible trademark. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir.1990). The Fourth Circuit has held that a court must place a challenged mark into one of four categories, (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary/fanciful, to determine its eligibility for protection. *Id.* (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)). Suggestive and arbitrary/fanciful marks are considered inherently distinctive and therefore automatically eligible for protection. *Perini*, 915 F.2d at 124–25. Descriptive marks are eligible for protection only upon a showing of secondary meaning, *i.e.*, an affirmative demonstration that consumers associate the mark with the product's source. *Id.* at 125. Generic marks are ineligible for trademark protection. *Id.* at 124.

■ A generic mark cannot receive trademark protection because "generic" and "trademark" are mutually exclusive terms. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("McCarthy") § 12:1 at 12–4 (4th ed.1998). The purpose of a trademark is to identify the source of the product it marks, thereby answering the question "who are you?". *Id.* A generic term, on the other hand, names the product itself and thus answers the question "what are you?". *Id.; see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) (defining generic term as one that "refers to the genus of which the particular product is a species"). Generic terms must remain in the public domain, free for all to use, in order to prevent one user from wielding trademark rights unfairly to its competitive advantage. *See Door Sys., Inc. v. Pro–Line Door Systems, Inc.*, 83 F.3d 169, 171 (7th Cir.1996).

## 2.

■ In essence, White Directory's basis for summary judgment is that the "walking fingers" is an unprotectible mark because AT & T placed it in the public domain as a generic symbol for the yellow pages. Although genericness is a question of fact, the court may resolve this issue at summary judgment "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *Door Sys.*, 83 F.3d at 171; *see also Convenient Food Mart, Inc. v. 6–Twelve Convenient Mart, Inc.*, 690 F.Supp. 1457, 1461 (D.Md.1988), *aff'd without opinion*, 870 F.2d 654, 1989 WL 21392 (4th Cir.1989) ("Although characterized by courts as an issue of fact, the genericness issue is ripe for resolution on summary judgment...."). Because the "walking fingers" is an unregistered mark, once White Directory raises the issue of genericness the burden falls on BellSouth to demonstrate that the symbol is not generic and thus that it is a valid and protectible mark. *See Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1041 (D.C.Cir.1989) (citing *Reese Publ'g Co., Inc. v. Hampton Int'l Communications, Inc.*, 620 F.2d 7, 11 (2d Cir.1980)).

■ On a record containing much of the same evidence as in the case at bar, in 1995 the Federal Circuit determined at the summary judgment stage that the "walking fingers" logo is generic. *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565 (Fed.Cir.1995). The Federal Circuit limited its holding, however, to the issue of the symbol's status in non-BellSouth territory because BellSouth had proposed concurrent use registration of the mark inside BellSouth territory, and once it was determined that the mark was generic outside BellSouth territory it was unnecessary to resolve its status inside. *Id.* at 1568, 1569 n. 3. The court upheld the Trademark Trial and Appeal Board's findings

> that '[t]here is no genuine issue of fact that many different entities have used and continue to use the walking fingers logo on classified telephone directories, and that directories bearing the logo and originating with different entities have been distributed throughout the United States,' that 'there is no genuine issue of fact that independent telephone companies and independent telephone directory publishing companies have been using the walking fingers logo on their classified telephone directories for many years,' and that 'there is no genuine issue that other Baby Bells or their operating companies have treated the walking fingers logo as being free for any company to use to identify its directory as containing yellow pages.'

*Id.* at 1568. The court concluded the Board properly granted summary judgment in favor of those opposing concurrent use registration, holding that

> [o]pposers ... clearly demonstrated that AT & T did not protect the logo prior to divestiture but rather allowed all other publishers to use the logo. AT & T's policy regarding the logo resulted in near universal use of the logo prior to and at the time BellSouth acquired separate rights to portions of AT & T's business and assets in the divestiture and sought to register the 'Walking Fingers' logo as a trademark. The opposers' evidence shows that at this time the use by other publishers was widespread and frequently in overlapping territories. From the totality of this uncontested evidence it is clear that the board properly concluded that the 'Walking Fingers' logo was in the public domain for the identified designation at the time of BellSouth's application. BellSouth therefore cannot claim succession to any trademark use by its predecessor company, AT & T.

*Id.* at 1570.

Although the court's holding was no broader than it needed to be, which meant that the court confined its finding of genericness to non-BellSouth territory, there is no evidence in the record here which

imposes such a limitation on the generic character of the "walking fingers" logo. The record in this case demonstrates that AT & T disavowed its interest in the symbol across the nation, without regard for Bell-affiliate or non-Bell-affiliate territory, and also that AT & T and its affiliates encouraged and permitted independent publishers to use the logo regardless of the areas encompassed by the directories on which it was displayed. John Garvin cited numerous examples of non-Bell-affiliate directories which overlapped with BellSouth territory and which employed the "walking fingers." Garvin Aff., Ex. 1, ¶¶ 6, 9, 11; Garvin Aff., Exs. E & F to Ex. 1. At no point in Hancharik's testimony does he cite any geographic limitation to the representations he made to publishers in the industry and to the operating companies regarding AT & T's position that the symbol was in the public domain. Indeed, as the court in *DataNational* stated, "AT & T's policy regarding the logo resulted in near universal use of the logo.... The opposers' evidence shows that [this] ... use by other publishers was widespread and frequently in overlapping territories." *DataNational*, 60 F.3d at 1570. Thus while the *DataNational* holding does not control the outcome here, the logic of its decision that the mark is generic outside BellSouth territory applies with equal force inside BellSouth territory.

Not only is evidence that the actions of AT & T and BellSouth's predecessors somehow limited the generic character of the "walking fingers" to non-BellSouth territory absent from the record, the record also affirmatively demonstrates that the territorial distinction upon which BellSouth's argument depends is meaningless with respect to yellow pages directories and the "walking fingers." Because the Greensboro metropolitan area includes both, BellSouth and non-Bell-South territory, BellSouth's Greensboro directory includes listings from non-Bell-

South territory, much as the directories for the abutting non-BellSouth territories include listings from BellSouth territory. This same phenomenon has occurred in other metropolitan areas in BellSouth's nine-state region. Wayne Collier Aff., ¶¶ 8–9, 13. In these situations, listings are not the only aspect of the directories which extend beyond the telephone companies' territorial boundaries. The Bell-South directory also will be distributed in non-BellSouth territory and BellSouth will solicit advertisements from businesses located in non-BellSouth territory, and vice versa. John Hudson Dep., pp. 20 & 29, Perlman Aff., Ex. A; James Brown Dep., pp. 99–100, Perlman Aff., Ex. B; Wayne Collier Aff., ¶¶ 9–10 & 13. Finally, BellSouth is a joint venturer in an Internet web site with a yellow pages search engine which advertises itself by using the "walking fingers" logo. Baumler Aff., ¶ 4 & Ex. B. By their very nature Internet web sites such as BellSouth's "At Hand" network do not respect territorial boundaries.[3]

▪ BellSouth deals with this problem of overlap in a way which belies its claim that the "walking fingers" logo serves as a brand identifier. Counsel for BellSouth states in his affidavit that

North State [a telephone company certified to provide local service in non-Bell-South territory] may elect to distribute its 'High Point directory' in Greensboro (BellSouth's service area). Since Greensboro residents and advertisers rely on the 'Walking Fingers' Logo on the High Point directory to identify the directory published by the telephone company that serves High Point (the designated area of the directory), such distribution does not cause confusion. Greensboro residents and advertisers will recognize a High Point directory bearing the 'Walking Fingers' Logo as

---

3. White Directory also has presented evidence that some fifteen other Internet web sites display the "walking fingers" logo in connection

with the yellow pages. Baumler Aff., ¶ 2 & Ex. A.

the directory published by the local telephone company—North State.

Schaetzel Aff., ¶ 9. To serve as a brand identifier, a mark must signify a *"single, albeit anonymous, source."* 1 McCarthy § 3:9 (emphasis added); *see also A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 300–01 (3d Cir.1986). BellSouth's argument reveals that even in BellSouth territory the "walking fingers" logo does not identify a single source; to the contrary, BellSouth argues that it identifies North State if the directory is produced by North State and BellSouth if the directory is produced by BellSouth. If the "walking fingers" logo truly were a trademark, additional information such as the geographic origin of the directory would not be necessary for the logo to notify its viewers of the directory's sponsor. At times BellSouth appears to argue that the "walking fingers" symbol is a brand identifier for whichever telephone company is certified to provide service in the area where the logo appears. Of course, this not only would mean the symbol signifies more than one source, it also would be flatly contrary to the holding in *DataNational,* which was that the "walking fingers" is generic in non-BellSouth territory. If BellSouth's argument is that the same mark can be generic on one side of the street and a brand identifier on the other, it is fundamentally implausible when directories from each side of the street include listings from both sides of the street, solicit advertisers from both sides of the street, and are distributed on both sides of the street.

BellSouth has presented surveys of consumers in 1987, 1990, and 1996 to suggest that the general public views the "walking fingers" as a brand identifier inside BellSouth territory.[4] Nancy Searcy Edwards Aff., Ex. P; Donald Payne Aff.; Teilhaber Aff., Ex. 14. Although BellSouth argues that its surveys create a genuine issue as to the symbol's status in BellSouth territory, the public's association between a mark and its proponent is insufficient to elevate what is otherwise a generic term to trademark status. *See Abercrombie & Fitch,* 537 F.2d at 9 ("[E]ven proof of secondary meaning, by virtue of which some 'merely descriptive' marks may be registered, cannot transform a generic term into a subject for trademark."); *Liquid Controls Corp. v. Liquid Control Corp.,* 802 F.2d 934, 939 (7th Cir.1986) ("[I]f a term [is] generic, use of that term alone [cannot] give rise to an unfair competition claim, even if many people [have] come to associate the term with the plaintiff.").

3.

■ This case does not fit neatly within the traditional structure used by courts to analyze the issue of genericness. McCarthy lists six different types of evidence which may be used to prove genericness or lack of genericness, including (1) competitors' use of the mark, (2) plaintiff's use of the mark, (3) dictionary definitions, (4) media usage, (5) testimony of persons in the trade, and (6) consumer surveys. 2 McCarthy 12:13 at 12–26 to 12–34. Ordinarily when the issue of genericness is raised, each side will offer evidence of the public's understanding of the mark in question, either directly through surveys or indirectly through trade usage, dictionary definitions, or other means. It is in this context that some courts have expressed a preference for direct forms of evidence (surveys) over other forms. *See Berner Int'l Corp. v. Mars Sales Co.,* 987 F.2d 975, 982–83 (3d Cir.1993). Nevertheless, in most collisions between competing forms of genericness evidence, a genuine issue of fact will exist.

Here, however, what is offered by White Directory (although akin to "plaintiff's use") is different from traditional indirect

4. BellSouth also has submitted a fourth study which suggests that citizens of Dade County, Florida, were confused in 1986 as to the source of Donnelly Publishing's directory and a fifth study which suggests that Greensboro residents were confused in 1997 as to the source of White Directory's Greensboro directory. Nancy Searcy Edwards Aff., Ex. O; Teilhaber Aff., Ex. 15.

evidence of genericness. White Directory prevails because it has demonstrated that AT & T, after developing the "walking fingers," immediately disclaimed any interest it might have had in the logo and encouraged all in the industry to display it as the symbol of the yellow pages. BellSouth has not presented a single piece of evidence which suggests otherwise. Also unchallenged in the record is the fact that after use of the "walking fingers" proliferated through the industry, AT & T not only acquiesced in such use but reaffirmed its disavowal of any trademark interest in the mark. Furthermore, BellSouth at no point counters White Directory's evidence that at all relevant times BellSouth's predecessors were on notice of AT & T's policies with respect to the symbol and the effects of its policies, and objected to neither. In fact, the Bell operating companies' directory publishers participated with AT & T in the decision not to seek registration of the mark in the 1970's. Hancharik Aff., ¶ 8.

AT & T and its operating companies not only represented to each other and to all in the industry that the mark was in the public domain, but also acted in a manner consistent with that understanding of the symbol's status before the public at large. For example, a Southern Bell publication which reported the modifications made on the symbol in 1975 called it "one of the best-known *product* identifications of all time." Perlman Aff., Ex. 29 to Ex. K (emphasis added). From the beginning AT & T often used the logo in national advertisements which promoted general use of the yellow pages. Hancharik Aff., Ex. A. Even more revealing, in 1978 AT & T issued guidelines to all Bell System directory publishers which instructed them to include either "Bell System" or the name of the relevant Bell operating company with the logo. Hancharik Aff., Ex. B. The guidelines explain that the addition of the publisher's name is needed for consumers to understand that the directory bearing the mark is affiliated with the Bell System, an explanation which Hancharik himself echoes. *Id.;* Hancharik Aff., ¶ 14. The Bell operating companies' use of their own names with the "walking fingers" belies BellSouth's argument today that the logo serves and has served as a brand identifier. If that were so it would not have been necessary to add the Bell operating company's name with the mark to trigger viewer perception of Bell sponsorship. *See Bayer Co. v. United Drug Co.,* 272 F. 505, 512 (S.D.N.Y.1921) (Hand, J.) (noting that plaintiff's label, "Bayer—Tablets of Aspirin," reflected plaintiff's own recognition that "aspirin" had fallen into public domain for consuming public); *In re Nosler Bullets, Inc.,* 169 U.S.P.Q. 62, 64, 1971 WL 16439 (T.T.A.B.1971) ("Moreover, the fact that applicant always uses the term 'NOSLER' in close association with 'partition bullets' further augments our finding that purchasers of applicant's goods would merely regard the latter term as the common descriptive name for its goods.").

In light of this unrebutted evidence, no genuine issue exists as to whether or not the "walking fingers" is in the public domain. In fact it has been so for over thirty years. In effect, "[a] kind of estoppel arises when the proponent of trademark use is proven to have itself used the term before the public as a generic name, yet now claims that the public perceives it as a trademark." 2 McCarthy § 12:13 at 12–27.[5]

Evidence that the proponent of a mark has treated it as being generic or has used

---

**5.** But AT & T and BellSouth's predecessors did more than simply "use the term before the public as a generic name." They affirmatively represented their belief that the logo was generic, used it in a generic manner, told others to do the same, and did not object when others did the same. This extreme conduct renders BellSouth's survey evidence irrelevant, in the sense that such conduct estops BellSouth from turning on its head over thirty years of history by now seeking trademark protection of the "walking fingers" logo.

it before the public in a generic fashion has led many other courts to deny trademark protection to the mark.[6] Judge Augustus Hand emphasized plaintiff's use in finding "cellophane" to be generic in *DuPont Cellophane Co., Inc. v. Waxed Prods. Co., Inc.*, 85 F.2d 75 (2d Cir.1936). Plaintiff DuPont and the French developers of the product from whom DuPont acquired production rights had labeled and advertised the product using "cellophane" generically. *Id.* at 80 ("The course of conduct of the complainant and its predecessors, and especially the complainant's advertising campaign, tended to make cellophane a generic term descriptive of the product rather than of its origin. . . ."). In *800 Spirits, Inc. v. Liquor By Wire, Inc.*, 14 F.Supp.2d 675 (D.N.J.1998), the court was presented with the question of whether "spirits" was a generic term for gifts of alcoholic beverages. In finding the term to be generic, the court treated the plaintiff's generic use of "spirits" in its catalogues as "strong" evidence of genericness. *Id.* at 679. Other courts have afforded similar weight to plaintiff's own generic use of a purported trademark. *See Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 906–07 (9th Cir. 1995) (cancelling federal registration of "Paramahansa Yogananda" where plaintiff's own product labels revealed that plaintiff did not intend to use the term as trademark); *Birtcher Electro Med. Sys., Inc. v. Beacon Labs., Inc.*, 738 F.Supp. 417 (D.Colo.1990) (denying preliminary injunction in infringement suit where evidence demonstrated that until plaintiff brought suit it never had intended to use "Argon Beam Coagulator" as trademark and its promotional materials indicated term was generic label for product itself); *Turtle Wax, Inc. v. Blue Coral, Inc.*, 2 U.S.P.Q.2d 1534, 1987 WL 123820 (T.T.A.B.1987) (cancelling registration of mark where proponent of mark and its competitors used mark in generic manner).

The court's grant of summary judgment to White Directory in this case is supported further by those cases where plaintiffs similarly have attempted to reverse a prior (and successful) effort to educate the public and those in the industry that the term in question identified the product. In *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655 (7th Cir.1965), for example, the court reversed a judgment in favor of plaintiff Duncan on its claim that defendant infringed its registered mark "Yo–Yo." The court found persuasive defendant's claim that the mark was generic, given the undisputed evidence that "plaintiff for more than twenty years employed the term 'Yo–Yo' in its descriptive and generic sense." *Id.* at 663. The court rejected plaintiff's survey evidence that interviewees associated the term with Duncan and rebuffed its attempt to reclaim "Yo–Yo" from the public domain by introducing the new term "return top." In so holding the court emphasized that plaintiff "did much to educate the public" that "Yo–Yo" was the generic name for the toy. *Id.* at 667.

The court relied on the prior "trampoline" and "thermos" cases, where courts likewise rejected a plaintiff's attempt to pull a generic term out of the public domain by introducing a substitute generic term. *See American Thermos Prods. Co. v. Aladdin Indus., Inc.*, 207 F.Supp. 9 (D.Conn.1962), *aff'd sub nom. King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577 (2d Cir.1963) (holding plaintiff's marks validly registered, but not infringed by defendant's generic use of "thermos," despite plaintiff's evidence that a segment of the population associated term with plaintiff, where "plaintiff itself inaugurated and disseminated the use of 'thermos' as a synonym for 'vacuum insulated' and as a

---

6. The proponents' conduct in such cases was fatal to their claims, even though their conduct fell far short of that exhibited here by AT & T and BellSouth's predecessors. The court has found no case where a court has been faced with "plaintiff's use" evidence as extreme as that in this case.

noun standing for the name of the product and it failed to use reasonable diligence to keep it from the public domain"); *Nissen Trampoline Co. v. American Trampoline Co.,* 193 F.Supp. 745 (S.D.Iowa 1961) (holding "trampoline" to be generic, despite plaintiff's claim that term had secondary meaning, where authors used term generically and plaintiff actively promoted generic use of term while it enjoyed a monopoly position). Here, by their own actions AT & T and the Bell operating companies caused the "walking fingers" to become the symbolic "name" of the yellow pages. BellSouth cannot now undo what has already been done.

4.

Although White Directory may not meet all the requirements of the several equitable arguments it makes, one point merits brief mention. In a copyright infringement suit instituted in 1982 and later appealed to the Eleventh Circuit, counsel for Southern Bell opened the second paragraph of their appellate brief's statement of the case with "First, as [defendant] observes, the Bell System makes no exclusive claim to the walking fingers logo and the term 'Yellow Pages'." Perlman Aff., Ex. H. That admission was not necessary to the outcome of the case, which precludes application of the doctrine of judicial estoppel, since BellSouth did not gain unfair advantage by adopting the prior position. *Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1166–67 (4th Cir.1982). Nevertheless, it is yet another example of the consistent stance BellSouth's predecessors took prior to divestiture with respect to the trademark status of the "walking fingers." The Eleventh Circuit noted in its opinion that "Southern Bell has not claimed exclusive ownership of either the term 'yellow pages,' the right to use yellow paper, or the walking fingers logotype. 'In fact,

they have been dedicated to the public domain and are, therefore, not the property of anyone.'" *Southern Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers,* 756 F.2d 801, 808 (11th Cir.1985).

5.

In sum, White Directory is entitled to summary judgment because the uncontested evidence overwhelmingly demonstrates that AT & T, which developed and implemented the "walking fingers" logo, placed the symbol in the public domain as a generic identifier of the yellow pages, by both its words and its actions. By using the logo as a product identifier, by encouraging others in the industry to do the same, and by consistently disavowing any trademark interest in the symbol for twenty years prior to divestiture, AT & T caused those in the yellow pages industry across the nation, without limitation, to use the logo as the symbol for the yellow pages. The evidence also is uncontradicted that BellSouth's predecessors, Southern Bell and South Central Bell, were on notice of this behavior by AT & T and others in the industry, that they did not object to such behavior, and that they exhibited similar behavior. In the face of this evidence, BellSouth cannot pull the symbol out of the public domain simply by introducing surveys which suggest that, in areas where BellSouth provides local telephone service, citizens associate the logo with BellSouth. *See Abercrombie & Fitch,* 537 F.2d at 9. Where the record so conclusively establishes that a term was placed in the public domain as a generic symbol by its creator and has been so used for over thirty years by all in the industry, including the proponents of the mark and its predecessors, survey evidence such as that presented by BellSouth cannot serve even to create a genuine issue as to the status of the mark.[7]

---

7. Although it would be improper for the court to weigh evidence at summary judgment, the court notes that both courts and commentators have deemed survey evidence to be of lesser utility on the question of genericness when there is the so-called "single source

problem." *See* 2 McCarthy §§ 12:17 & 12:49; *A.J. Canfield,* 808 F.2d at 302. According to McCarthy, when there is only one source of a product, "it is difficult to determine whether a name is regarded by the public as generic or is regarded as indicating only that source."

■ For these reasons, BellSouth has no claim under Section 43(a) of the Lanham Act, and Count I of its complaint will be dismissed. Because a mark must have a higher degree of distinctiveness to enjoy protection from dilution under Section 43(c) of the Lanham Act than it must to be protected by Section 43(a), Count II of BellSouth's complaint also will be dismissed. 15 U.S.C. § 1125(c) (affording protection from dilution only to "famous" marks); *see also* Restatement (Third) of Unfair Competition § 25, comment e (1995) ("Not all trademarks warrant protection against a dilution of the marks' distinctiveness."); 3 McCarthy § 24:91 at 24–149 ("By definition, all 'trademarks' are 'distinctive'—very few are 'famous.'").

### B. *BellSouth's Alternative Claims for Relief*

#### 1.

■ BellSouth makes several arguments as to why it is entitled to relief, even if the "walking fingers" logo is found to be generic. First, it argues that if AT & T placed the logo in the public domain prior to divestiture, it has reclaimed it since then, citing *Singer Mfg. Co. v. Briley,* 207 F.2d 519 (5th Cir.1953). This theory is unavailing to BellSouth, however,

because it has offered no evidence, other than the surveys already mentioned, that the "walking fingers" logo has lost its generic meaning. In *Miller Brewing Co. v. Falstaff Brewing Corp.,* 655 F.2d 5 (1st Cir.1981), Miller brought suit claiming the defendant had infringed upon trademark rights it enjoyed in "LITE," a term which had been held generic in the 1970's. To support its claim, Miller presented evidence that there was a significant association between Miller and "LITE" in the minds of the public. The court held such evidence to be irrelevant and the *Singer* doctrine inapplicable because "[t]here was no evidence that as of today 'LITE' has *ceased* to have in current usage among consumers of beer the generic meaning, 'beer of low caloric content.'" *Id.* at 9 (emphasis in original). Because BellSouth has failed to adduce any evidence supporting reclamation beyond evidence of consumer association of the "walking fingers" with BellSouth, its reliance on the *Singer* doctrine must fail.

#### 2.

■ Next, BellSouth argues that it is entitled to relief under the doctrine of "passing off" even if the "walking fingers" logo is generic. The Fourth Circuit never has employed the doctrine of "passing off"

2 McCarthy § 12:49 at 12–96. The association that persons often display between a generic mark for a product and the single producer of that product has been termed *"de facto* secondary meaning," and it cannot create a trademark interest in what is otherwise a generic term. *See* 2 McCarthy §§ 12:47 through 12:49; *A.J. Canfield,* 808 F.2d at 297; *Reese Publ'g,* 620 F.2d at 12 n. 2. While the instant case is not a classic example of the single source problem, since it involves use of the "walking fingers" by multiple publishers in the same region, BellSouth's surveys call into question their own validity. Of the 291 interviewees meeting Jacoby's qualification criteria (a demonstrated understanding of the difference between brand and product symbols), fully ninety-four believed there to be only one producer of yellow pages directories *across the nation.* Teilhaber Aff., Ex. 14, p. 13. Although the other two-third's (⅔) correctly stated that more than one yellow pages directory publisher exists in the United States,

the surveyor's question did not establish whether the interviewees knew that more than one yellow pages publisher exists in their region. In fact, Hollander's 1997 study of consumer confusion regarding the source of White Directory's Greensboro directory sheds light on the issue. Of the ninety interviewees who believed White Directory's directory was published by BellSouth or Southern Bell, seventy-eight indicated that they believed so because BellSouth "was their telephone company." Teilhaber Aff., Ex. A, p. 10 to Ex. 15. Not one person of the ninety stated that he or she believed the directory to be a BellSouth directory because the "walking fingers" appeared on the cover. In sum, the results of BellSouth's surveys suggest that there may well be a single source problem here and that these surveys are not entitled to much weight. As stated above, however, summary judgment is proper even if the surveys suggest exactly what BellSouth would have them suggest.

to proscribe the use of a purported trademark that it held to be generic, and McCarthy has disapproved of the theory. 2 McCarthy § 12:48 at 12–95. Those courts which do apply the doctrine, however, emphasize that its purpose is to eliminate fraud and to prevent new entrants in a market once dominated by a monopolist from using the generic mark for the product in a manner confusingly similar to that of the monopolist. *See Blinded Veterans Ass'n*, 872 F.2d at 1042–45; *Liquid Controls*, 802 F.2d at 940. In seeking to make out its passing off claim, BellSouth offers as evidence only White Directory's use of the "walking fingers" and survey evidence of confusion. This showing is insufficient in the absence of additional evidence that White Directory took affirmative steps which increased the likelihood of confusion. *See Blinded Veterans Ass'n*, 872 F.2d at 1046 (holding evidence of *de facto* secondary meaning and of use of the generic term insufficient to establish passing off claim, where plaintiff failed to point to "specific actions" by defendant which increased risk of confusion); 2 McCarthy § 12:48 at 12–95 ("In the author's opinion, in order to obtain some form of relief on a 'passing off' claim, the user of a generic term must prove some false or confusing usage by the newcomer *above and beyond* mere use of the generic name.") (emphasis in original). A casual observation of the covers of BellSouth's and White Directory's yellow pages directories reveals the marked dissimilarity in their appearance. See Perlman Reply Aff., Exs. A & B.

### 3.

BellSouth also argues that the doctrine of "residual goodwill" precludes summary judgment. This doctrine is wholly inapplicable here because it is relevant only when a defendant asserts that a mark has been abandoned through non-use (for example, due to the termination of a business or the sale of its assets). *See generally* 2 McCarthy §§ 17:14 through 17:15. In such a situation, courts have permitted the proponent of a mark to counter a defendant's contention that the goodwill symbolized by a mark has evaporated during a period of non-use by demonstrating that goodwill in the mark has persisted and that the proponent intends to resume use of the mark. *See Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1060 (2d Cir.1985) ("The policies and practices of prior abandonment cases are consistent with the preservation of [a] mark [despite the sale of assets or termination of a business], so long as (a) the goodwill of the concern has not wholly dissipated, (b) the owner or its assignee retains the intent to produce or market within a reasonable time a product or service substantially the same in nature and quality as that with which the trademark has been associated, and (c) such resumption of operations occurs within a reasonable time under the circumstances."), *cited in Seidelmann Yachts Inc. v. Pace Yacht Corp.*, 14 U.S.P.Q.2d 1497, 1503 (D.Md.1989), *aff'd*, 898 F.2d 147, 13 U.S.P.Q.2d 2025 (4th Cir.1990) (holding mark not abandoned because mark retained goodwill and use resumed within reasonable time). Thus, because goodwill fades only gradually, under certain circumstances a mark claimed to have been abandoned still can enjoy trademark protection.

Here White Directory does not maintain that the "walking fingers" has been abandoned through non-use. Instead, White Directory prevails because it has demonstrated that AT & T, BellSouth's predecessors, and BellSouth never had any trademark interest in the symbol that could later be abandoned. Furthermore, BellSouth cannot show that it intended to resume use of the "walking fingers" as a trademark because neither AT & T nor BellSouth's predecessors ever used it as a trademark in the first place.

### 4.

BellSouth also asserts several state law grounds for relief in Counts III, IV, and V of its complaint. It claims that White Directory has violated North Carolina General Statutes Section 75–1.1, which prohibits unfair and deceptive trade

practices, and has engaged in unfair competition and trademark infringement under North Carolina common law. BellSouth's common law infringement claim fails for those reasons discussed above with regard to BellSouth's claim under Section 43(a) of the Lanham Act. As to Section 75–1.1, the Fourth Circuit has held that "[a] practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145, 148 (4th Cir.1987). The standard which a plaintiff must meet to recover on an unfair competition claim under the common law is not appreciably different. *See Carolina Aniline & Extract Co. v. Ray,* 221 N.C. 269, 20 S.E.2d 59, 61–62 (1942). Because BellSouth has not come forward with any facts which suggest that White Directory's conduct was unfair or deceptive, beyond its use of a symbol which the court holds to be a product identifier, BellSouth's common law and statutory claims of unfair competition must fail as well.

## CONCLUSION

For the foregoing reasons, the court will grant White Directory's motion for summary judgment, and this action will be dismissed with prejudice.