THIS OPINION IS A
PRECEDENT OF THE TTAB

Oral Hearing:                          Mailed:
November 6, 2008                       March 25, 2009

**UNITED STATES PATENT AND TRADEMARK OFFICE**
———

**Trademark Trial and Appeal Board**
———

Stuart Spector Designs, Ltd.
v.
Fender Musical Instruments Corporation

Opposition No. 91161403
to application Serial No. 76516127
filed on April 25, 2003

———

U.S. Music Corporation
v.
Fender Musical Instruments Corporation

Opposition No. 91161405[1]
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

———

Warmoth Guitar Products, Inc.
v.
Fender Musical Instruments Corporation

Opposition No. 91161406
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

---

[1] The November 23, 2005 order dismissing this proceeding was vacated on December 12, 2005. The electronic case file has now been updated to reflect this correction. Opposition Nos. 91162245, 91162246 and 91162923 were dismissed without prejudice on September 9, 2005. Two other proceedings, Opposition Nos. 91161269 and 91162484, were dismissed with prejudice under separate orders, December 12, 2005 and February 11, 2008, respectively.

_____

Indoor Storm, Ltd.
v.
Fender Musical Instruments Corporation

Opposition No. 91161411
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

_____

Tradition Guitars, Inc.
v.
Fender Musical Instruments Corporation

Opposition No. 91161413
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

_____

Raise Praise, Inc. d/b/a Tom Anderson Guitar Works
v.
Fender Musical Instruments Corporation

Opposition No. 91161420
to application Serial Nos. 76516126, 76515928
filed on April 25, 2003

_____

Schecter Guitar Research, Inc.
v.
Fender Musical Instruments Corporation

Opposition No. 91161422
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

_____

JS Technologies, Inc.
v.
Fender Musical Instruments Corporation

Opposition No. 91161486
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

_____

W D Music Products, Inc.
v.
Fender Musical Instruments Corporation

Opposition No. 91161518
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

_____

Sadowsky Guitars Ltd.
v.
Fender Musical Instruments Corporation

Opposition No. 91161519
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

_____

The ESP Guitar Company
v.
Fender Musical Instruments Corporation

Opposition No. 91161520
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

_____

Lakland Musical Instruments, LLC
v.
Fender Musical Instruments Corporation

Opposition No. 91162312
to application Serial No. 76516127
filed on April 25, 2003

_____

Michael Tobias
v.
Fender Musical Instruments Corporation

Opposition No. 91162313
to application Serial No. 76516127
filed on April 25, 2003

_____

Richard Keldsen
v.
Fender Musical Instruments Corporation

Opposition No. 91162483
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

_____

Levinson Music Products, Ltd.
v.
Fender Musical Instruments Corporation

Opposition No. 91162485
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

_____

James Triggs
v.
Fender Musical Instruments Corporation

Opposition No. 91162497
to application Serial Nos. 76516126, 76515928
filed on April 25, 2003

_____

Peavey Electronic Corporation
v.
Fender Musical Instruments Corporation

Opposition No. 91162498
to application Serial Nos. 76516126, 76516127, 76515928
filed on April 25, 2003

_____

Ronald S. Bienstock of Bienstock & Michael, P.C. for Stuart
Spector Designs, Ltd., et al.

Daniel A. Crowe of Bryan Cave LLP for Fender Musical
Instruments Corporation.

_____

Before Hairston, Kuhlke and Walsh, Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Applicant, Fender Musical Instruments Corporation (FMIC), seeks registration of the marks shown below for goods identified in each application as "guitar bodies" in International Class 15. Each of the applications includes the following description of the marks, "The mark consists of a fancifully shaped configuration of the body portion of a guitar." The applications are based on use in commerce under Trademark Act Section 1(a), 15 U.S.C. §1051(a), and seek registration based on acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. §1052(f).



[2] Application Serial No. 76516126, filed on April 25, 2003, alleging 1954 as the date of first use and first use in commerce. Throughout the decision this design is referred to as "126." This design corresponds to applicant's Stratocaster guitar.

[3] Application Serial No. 76515928, filed on April 25, 2003, alleging 1949 as the date of first use and 1950 as the date of first use in commerce. Throughout the decision this design is referred to as "928." This design corresponds to applicant's Telecaster guitar.

Opposers have opposed registration of applicant's marks on the grounds that they are generic or, in the alternative, have not acquired distinctiveness in view of the widespread use of identical and substantially similar configurations by third parties over several decades.

Applicant filed answers by which it denied the salient allegations.[5] The case is fully briefed and an oral hearing was held on November 6, 2008.

## EVIDENTIARY ISSUES

The evidence of record, as fully referenced in the parties' briefs, is voluminous, consisting of many testimony depositions on behalf of opposers and applicant, respectively, all with accompanying exhibits, and numerous additional exhibits made of record by the parties' notices of reliance (NOR). The parties have asserted many objections on various grounds and preserved these objections in appendices attached to their briefs. In addition, opposers, on December 17, 2007, filed a motion to strike large portions of applicant's notice of reliance, filed on October 31, 2007.

---

[4] Application No. 76516127, filed on April 25, 2003, alleging 1951 as the date of first use and 1957 as the date of first use in commerce. Throughout the decision this design is referred to as "127." This design corresponds to applicant's Precision Bass, also called P Bass, electric bass guitar.

[5] Applicant's answers include "affirmative defenses" (e.g., unclean hands and equitable estoppel); however, inasmuch as applicant did not address them in its brief, they are waived and we give them no further consideration.

We first address opposers' motion to strike and rule as follows. The motion is granted as to the in-house publications/catalogs Frontline and Bass Street, and the auction catalogs from the Crossroads guitar auction and the Guitarmania auction. The distribution of these publications to retailers, trade shows, guitar clinics and to individuals upon request does not constitute "general circulation" within the meaning of Trademark Rule 2.122(e). Thus, these documents are not proper matter for submission under a notice of reliance. Carefirst of Maryland, Inc. v. FirstHealth of the Carolinas, Inc., 77 USPQ2d 1492 (TTAB 2005); Hard Rock Cafe Licensing Corp. v. Elsea, 48 USPQ2d 1400 (TTAB 1998); Glamorene Products Corp. v. Earl Grissmer Co., 203 USPQ 1090 (TTAB 1979); Hunt-Wesson Foods, Inc. v. Riceland Foods, Inc., 201 USPQ 881 (TTAB 1979). The motion also is granted as to the press clippings. Harjo v. Pro-Football Inc., 50 USPQ2d 1705, 1722 (TTAB 1999), rev'd on other grounds, 284 F. Supp.2d 96, 68 USPQ2d 1225 (D.D.C. 2003) (press clippings not admissible under notice of reliance). We note, however, that many, if not all, of these documents were properly introduced as exhibits through testimony and have been considered within that context.

The motion is denied with regard to the American Ways and Diamondback magazines inasmuch as applicant has shown

the public availability and general circulation of these publications.

The motion is granted as to the excerpts from foreign publications, inasmuch as applicant has only stated and not shown that these publications are in general circulation in the United States. However, the publication shown to be in general circulation in the United States, while written in Spanish, is acceptable under notice of reliance in this case, inasmuch as it is merely used to show how the product is displayed to relevant consumers in the United States.

With regard to the objection as to inadequate identification for the newspaper and magazine excerpts, the motion is granted as to any of the submissions that do not have a date and is otherwise denied inasmuch as applicant has provided sufficient information as to the remaining documents. With regard to the documents that contain what opposers term "handwritten testimony," the motion is denied; however, the Board will not consider any of the notations on the documents.[6]

As to opposers' remaining objections, they have been rendered moot by applicant's correction of its notice of reliance, withdrawal of an internet print out, and corrected service of purportedly missing documents.

---

[6] We add that consideration of any of the evidence excluded above would not change the decision.

As noted above, the parties attached appendices to their briefs that contain their respective "statement of objections" on various grounds, including hearsay, lack of foundation, lack of personal knowledge, incompetence of proffered experts, documents not produced during discovery, and evidence not admissible by notice of reliance. They are voluminous and are specifically addressed, infra, to the extent the Board has relied on any of the evidence under objection in rendering its decision. However, we rule on the more general issues as follows.

Opposers' objections based on hearsay in section A of their appendix are overruled for the reasons presented in applicant's response brief. Opposers' objections based on relevancy and materiality in section D of its appendix are overruled; the testimony and exhibits that concern goods other than guitars (i.e., various merchandising items) are relevant to the issue of acquired distinctiveness as to the goods in issue, namely, guitar bodies. The issue is the probative value and the weight to be given this evidence.

Applicant, in its Statement of Objections, objects to the exhibits opposers submitted under notice of reliance stating that "the Board should limit admissibility of all of opposers' references and exhibits to only what the exhibit shows on its face." Applicant expends five pages to state the obvious. We shall consider these articles or

advertisements for whatever they may show on their face, but not for the truth of the matters asserted therein. See, e.g., Logicon, Inc. v. Logisticon, Inc., 205 USPQ 767 (TTAB 1980). Thus, with regard to applicant's hearsay objections to the various documents relied on by opposers, they are overruled to the extent that the matter is admissible and has been made properly of record by way of notice of reliance. This issue goes to the probative value of the individual exhibits, and while they may not be considered for the truth of the matter asserted, they may be used to show, for example, that opposers or third parties advertised the guitar or guitar parts in the publications on those dates. See Gravel Cologne, Inc. v. Lawrence Palmer, Inc., 469 F.2d 1397, 176 USPQ 123 (CCPA 1972); Wagner Electric Corp. v. Raygo Wagner, Inc., 192 USPQ 33, 36 n. 10 (TTAB 1976). In addition, they may be used to show that opposers' or third parties' guitars appeared in an article or advertisement and that the public has been exposed to the articles or advertisements and may be aware of the information contained therein. Harjo v. Pro-Football Inc., 50 USPQ2d at 1721 n. 50.

To the extent an objection has not been specifically addressed above in our consideration of evidentiary objections or below in our discussion of what the evidence of record shows as to the merits of these consolidated

cases, we have considered the evidence, keeping in mind the objections, and have accorded whatever probative value it merits.

Finally, much of the evidence of record is marked as confidential and, therefore, we must refer to some information in a more general manner in the decision.

## THE PARTIES

Applicant[7] manufactures, sells and distributes musical instruments, including, but not limited to guitars[8] throughout the world, including the United States. Notice of Opposition ¶ 5; Answer ¶ 5. With the exception of Indoor Storm, opposers also manufacture and/or sell guitars and/or guitar kits in the United States. See footnote 9. Indoor Storm is a retail store that sells applicant's guitars as an

---

[7] All references to applicant include its predecessors-in-interest, unless otherwise noted. While opposers have attempted to put into question applicant's acquisition of rights from its predecessors, this issue was not pleaded or tried by express or implied consent of the parties. To the extent opposers argue that the issue is simply part of applicant's burden to show acquired distinctiveness, i.e, if it relies on the predecessor's use it must establish its rights to the benefit of that use, opposers, in paragraph 8 of their respective notices of opposition, include allegations, admitted to by applicant, that "applicant or its predecessors-in-interest began using the body design." Applicant was clearly not put on notice that its acquisition of rights would be in issue. In any event, the testimony of Mr. Holtry, applicant's associate general counsel, is sufficient for that purpose and opposers' speculation as to any deficiencies in that testimony is not sufficient to rebut it.

[8] For simplicity, the word "guitars" means electric guitars and electric bass guitars, unless otherwise noted.

11

authorized dealer along with guitars from other manufacturers.  Abrams Test. pp. 11-13, 92.

### STANDING

Each opposer has demonstrated a real interest in preventing registration of the proposed marks as they are either competitors (guitar manufacturers and/or sellers) or retailers of the goods in the applications.[9]  See Ritchie v. Simpson, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); De Walt, Inc. v. Magna Power Tool Corp., 289 F.2d 656, 129 USPQ 275, 280 (CCPA 1961) (damage presumed or inferred when the mark sought to be registered is descriptive of the goods and opposer is one who has a sufficient interest in using the descriptive term in its business); Plyboo American, Inc. v. Smith & Fong Co., 51 USPQ2d 1633, 1634 (TTAB 1999) (competitor has standing to oppose).  Thus, each opposer has established its standing.

---

[9] Spector Test. pp. 3, 23; U.S. Music Corporation, App. NOR § III U.S. Music Corporation's Answer to Applicant's First Set of Interrogatories Int. No. 18; Warmoth Test. pp. 9, 12-14; Indoor Storm, Abrams Test. pp. 11, 12, 86, 92; Tradition Guitars, Chris Donahue, Stip. Aff., App. NOR § III Tradition's response to Int. No. 18; Schecter Guitar Research, Ciravolo Test. p. 8, 10, 48, Anderson Test. pp. 15-17; JS Technologies, Suhr Test. p. 9, 22, 23; Raise Praise, Anderson Test. pp. 11, 19; W D Music, App. NOR § III, W D's response to Int. No. 18; Sadowsky Test. pp. 6, 7, 11, 13; ESP Guitar Company, Masciandro Test. pp. 6, 9-11; Lakland, Lakin Test. p. 3; Tobias Test. pp. 4, 14; Keldsen Test. pp. 9, 11, 14; Levinson Test. pp. 6, 11, 16; Triggs, App. NOR § III Int. Nos. 11, 18; Peavey Test. pp. 12-16, 84.  Opposers may rely on these interrogatory responses, inasmuch as applicant has placed these responses into the record under notice of reliance. Trademark Rule 2.120(j)(7).

## ACQUIRED DISTINCTIVENESS/GENERICNESS

As noted above, opposers have challenged registration of these proposed marks on the claims that they are generic, or in the alternative, have not acquired distinctiveness, given the opposers' and third-parties' use of these shapes.

### Acquired Distinctiveness

Configurations of products are not inherently distinctive and may only be registered as marks upon a showing of acquired distinctiveness. See Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 US 205, 54 USPQ2d 1065 (2000). In an opposition proceeding, opposer has the initial burden to present prima facie evidence or argument upon which we could reasonably conclude that applicant's mark has not acquired distinctiveness. If opposer does so, the burden of proof shifts to applicant to prove by at least a preponderance of the evidence that the mark has acquired distinctiveness. Yamaha Int. Corp. v. Hoshino Gakki Co. Ltd., 840 F.2d 1572, 6 USPQ2d 1001, 1004-1008 (Fed. Cir. 1988). "[T]he only relevant issue before this court on appeal, as it should have been before the board, is which party should prevail on the entire record." Yamaha, 6 USPQ2d at 1006. However, the burden of persuasion under Section 2(f) on the issue of acquired distinctiveness is on the applicant. Id.

13

"Distinctiveness is acquired by 'substantially exclusive and continuous use' of the mark in commerce." In re Owens-Corning Fiberglas Corporation, 774 F.2d 1116, 227 USPQ 417, 424 n. 11 (Fed. Cir. 1985), citing, Levi Strauss & Co. v. Genesco, Inc., 742 F.2d 1401, 222 USPQ 939, 942 (Fed. Cir. 1984). An applicant must show that the primary significance of the product configuration in the minds of consumers is not the product but the source of that product in order to establish acquired distinctiveness. See In re Steelbuilding.com, 415 F.3d 1293, 75 USPQ2d 1420, 1422 (Fed. Cir. 2005); In re Ennco Display Systems Inc., 56 USPQ2d 1279 (TTAB 2000).

Acquired distinctiveness may be shown by direct and/or circumstantial evidence. Direct evidence includes actual testimony, declarations or surveys of consumers as to their state of mind. Circumstantial evidence is evidence from which consumer association might be inferred, such as years of use, extensive amount of sales and advertising, and any similar evidence showing wide exposure of the mark to consumers. There is no fixed rule for the amount of proof necessary to demonstrate acquired distinctiveness, however, the burden is heavier for product configurations. In re Ennco, 56 USPQ2d at 1283 (product configurations face a heavy burden to establish secondary meaning). See also Yamaha, 6 USPQ2d at 1008 (evidence required to show acquired

distinctiveness is directly proportional to the degree of non-distinctiveness of the mark at issue). Thus, even long periods of substantially exclusive use may not be sufficient to demonstrate acquired distinctiveness. Moreover, the burden is particularly heavy when that use has not been exclusive. In re Gibson Guitar Corp., 61 USPQ2d 1948, 1952 (TTAB 2001) (66 years of use not sufficient given similarity of configuration to other guitars). See also Flowers Industries Inc. v. Interstate Brands Corp., 5 USPQ2d 1580, 1588-89 (TTAB 1987) ("long and continuous use alone is insufficient to show secondary meaning where the use is not substantially exclusive").

## Genericness

In addition, product configurations may become generic. Sunrise Jewelry Manufacturing Corp. v. Fred S.A., 175 F.3d 1322, 50 USPQ2d 1532, 1535 (Fed. Cir. 1999) ("generic name" in Section 14 of the Lanham Act 15 U.S.C. Section 1064(3), "must be read expansively to encompass anything that has the potential but fails to serve as an indicator of source, such as names, words, symbols, devices, or trade dress"). "[R]egistration of an incontestable mark that is a product design may be cancelled if the mark is generic." Id. at 1533. By extension, generic product design can not be registered. Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§1051, 1052 and 1127. See Malaco Leaf, AB v. Promotion In

15

Motion, Inc., 287 F. Supp.2d 355 (S.D.N.Y. 2003) ("It is axiomatic that generic product designs are not entitled to trade dress protection under the Lanham Act, and that "even a showing of secondary meaning is insufficient to protect product designs that are overbroad or generic"; evidence of extensive third-party use supports a finding that the Swedish Fish design is generic; evidence of failure to police its trade dress for decades is further evidence that the Swedish Fish trade dress is weak and has not acquired distinctiveness); Abercrombie & Fitch Stores Inc. v. American Eagle Outfitters Inc., 280 F.3d 619, 61 USPQ2d 1769, 1781 (6th Cir. 2002) ("no designer should have a monopoly on designs regarded by the public as the basic form of a particular item"). See also BellSouth Corp. v. DataNational Corp., 60 F.3d 1565, 35 USPQ2d 1554 (Fed. Cir. 1995) ("competitor use [of logo] is evidence of genericness"); BellSouth Corp. v. White Directory Publishers, Inc., 42 F. Supp.2d 598, 49 USPQ2d 1801 (M.D.N.C. 1999) ("such conduct estops BellSouth from turning on its head over thirty years of history by now seeking trademark protection of the walking fingers logo").

In the context of product design, genericness may be found where the design is, at a minimum, so common in the industry that it cannot be said to identify a particular source. See Walker & Zanger Inc v. Paragon Industries Inc.,

16

465 F. Supp.2d 956, 84 USPQ2d 1981, 1985 (N.D. Cal. 2006) ("Cases addressing product design suggest that the term 'genericness' covers three situations: (1) if the definition of a product design is overbroad or too generalized; (2) if a product design is the basic form of a type of product; or (3) if the product design is so common in the industry that it cannot be said to identify a particular source"). Further, "[c]ourts exercise 'particular caution' when extending protection to product designs because such claims present an acute risk of stifling competition." Id. at 1984, citing, Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 42 USPQ2d 1641, 1646 (2nd Cir. 1997). This is because "[w]hile most trademarks only create a monopoly in a word, a phrase or a symbol, granting trade dress protection to an ordinary product design...create[s] a monopoly in the goods themselves." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 59 USPQ2d 1813 (2nd Cir. 2001). Cf. Wal-Mart, 54 USPQ2d at 1069 (in discussing whether product design could ever be inherently distinctive the court stated: "Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness").

17

"[C]ases have recognized that competitor use is evidence of genericness."  BellSouth Corp. v. DataNational Corp., 35 USPQ2d at 1558.

**ANALYSIS**

Genericness

We first address whether the configurations are so common in the industry as to be generic and, thus, incapable of registration.  Similar to the circumstances in BellSouth, supra, this case presents many (seventeen) opposers testifying to their own use and observation of third-party uses of identical and substantially similar guitar body shapes in the United States.

Third-party Uses

As stated above, competitor use of the same or substantially similar designs is evidence of genericness. The record shows that, at least from the mid-1970s, consumers in the United States have been exposed to guitars in the 126, 928 and 127 shapes emanating from third parties. Opposers have presented unrebutted testimony that they have offered for sale identical and substantially similar guitars in the United States and have seen identical or substantially similar guitars offered in the United States

by parties other than applicant since at least the 1970s.

Below is a sampling of the testimony as to each shape.[10]

127 Body Configuration

Daniel Lakin, owner of opposer Lakland Musical

Instruments LLC, testified as follows:

> A. Well, I mean, I saw not just the one – in '76 I saw not just the Precision Bass that Fender made but there were companies making the same design. Ibanez is the company that I remember particularly because I bought a Jazz bass version of a Fender J bass version. Ibanez. And they also made a P bass at the time...There's also a company named Univox that made them...Then moving on, it seemed like everybody was making them. Peavey was definitely making them. Kramer I believe made a P bass. Yamaha made a bass that was either – it was very close to a P bass, I don't think it had a pick guard so it looked a little bass...Well, I saw when I first started playing, and then getting into it, I've seen – it seems like I've seen ads going back all the way to the '60s. Just looking through old magazines and things like that. '70s seems to be when it really started to hit, the volume of these copies, if you will. Although there was a company, Tokai, that was known for making them...

---

[10] During testimony applicant objected to opposers' exhibits Nos. O-107, 108 and 109 on the basis that they were not authenticated and/or were leading because they contain respectively the words Stratocaster, Telecaster and Precision Bass. These exhibits are drawings of guitar body configurations that are identical to the drawings in the subject applications that opposers used to elicit testimony regarding comparisons between the drawings in the exhibits and other guitar bodies. We do not find these exhibits to be tainted by the fact that they contain the obvious in that they are identical to the drawings in the applications and there is no dispute that those drawings represent applicant's Stratocaster [126], Telecaster [928] and Precision Bass/P Bass [127] guitars. Further, these exhibits are not claimed to be anything other than a drawing upon which the witness may make a comparison. In view thereof, applicant's objections to these exhibits are overruled. For clarity, we refer to the corresponding shape (i.e., 126, 928 or 127) in brackets.

19

Lakin Test. pp. 10-11, 15-16.

> A.   Lakland has made and sold a model that is identical to P Bass body shape since 1999.

Lakin Test. p. 13, Exh. Nos. O-75, 78, 80, 85 (Lakland advertised its identically shaped bass monthly in the magazine Bass Player from 1999-2004.  Lakin Test. p. 78).

Opposer, Michael Tobias, a guitar manufacturer, testified that Veneman imported basses with the "P Bass shape" and he saw them in shops in the mid 70s.  Tobias Test. pp. 39-40.  He further testified that Aria, Schecter and at least "100's of others" sold "P Bass body shapes" in the 70s.  Tobias Test. pp. 41, 74-75.

> Stuart Spector testified that:

> A.   Dozens and dozens of other manufacturers make basses in the shape of P Bass, e.g., Cort, Samick, Sadowsky, Fernandez, ESP, Schecter...

Spector Test. pp. 17-18, see also Exh. Nos. O-2 and O-3.[11]

Richard Sadowsky, owner of opposer Sadowsky Guitars Ltd., testified that he first started making basses in the "P Bass shape" shape in 1982.  Sadowsky Test. p. 43, see also Exh. Nos. O-30, 34 (advertisements in Bass Guitar magazine and Guitar World magazine).  He also testified that

---

[11] Stuart Spector, owner and president of opposer Stuart Spector Designs Ltd, and former director of research and development for Kramer Musical Instruments.  Applicant, in its statement of objections, objected to Exh. No. O-2 as lacking in foundation and not authenticated.  The objection is overruled.  The testimony of Mr. Spector provides sufficient foundation for him to authenticate his own company's catalogs.

others, including Schecter, ESP, and DeMarzio make this shape. Sadowsky Test. p. 44.

> A. ...However, I would say that from the early '60s onwards and definitely into the mid-60s a lot of far eastern manufacturers were, as that source of production became prevalent, utilizing not only Fender shapes, but Rickenbacker shapes. Essentially we are using two or three generic American manufactured shapes.

Moorhouse Test. p. 39, see also pp. 168-171 for foundation.[12]

### 928 Body Configuration

Michael Tobias testified to seeing guitars offered for sale in the United States with the 928 body shape in the mid to late 70s made by Aria (Tobias p. 6) and Danny Gratton (Tobias Test. p. 38). Richard Sadowsky testified that he has seen third-party 928 shaped guitars at trade shows, in the press and on television, and that other manufacturers of this shape include Tokai, Schecter, ESP, and Sadowsky. Sadowsky Test. p. 76. He testified that Sadowsky first built a 928 shaped guitar in 1981 and continues to sell 928 shaped guitars. Sadowsky Test. pp. 77-78, see also Exh. Nos. 45[13] (advertisement in 1990 Guitar Player magazine) and 49 (page from Sadowsky product brochure). Keith Richards

---

[12] Barry Moorhouse owns the music retail and distribution company The Bass Center and House Music that originated in England and later expanded to the United States. He is also the author of the book The Bass Book.

and Prince own and play Sadowsky guitars with the 928 shape (Sadowsky Test. p. 88) as do many others, including Pat Metheny, Gilberto Gil, Dary Stuermer, John Abercrombie (Sadowsky Test. pp. 90-95).

### 126 Body Configuration

Michael Tobias testified that in the 1970's Aria and Schecter made and sold guitars with the 126 shape. Tobias Test. pp. 10, 41. Stuart Spector testified that Kramer made a guitar with the 126 shape. Spector Test. pp. 14-16. Richard Sadowsky testified that many others besides Sadowsky made 126 shaped guitars including Hoshino, Tokai, Schecter, ESP, DeMarzio, and Morris. Sadowsky Test. p. 15.[14] Sadowsky has made a guitar in the 126 shape since 1979. Sadowsky Test. p. 26, see also Exh. O-14 (example of 1986 Sadowsky guitar in 126 shape); Exh. No. O-18 (2002/2003 Guitar World Buyers Guide featuring Sadowsky guitars in 126 shape); Exh. No. 19 (1993/94 brochure of Sadowsky guitars in 126 and 928 style).[15] Sadowsky Guitars has displayed its guitars on its website since 1996. Sadowsky Test. p. 28, see also Exh. Nos. O-20, 21. Paul Simon purchased a Sadowsky guitar in the 126 shape in 1983 and Bruce

---

[13] Applicant's objection to this exhibit on the basis of hearsay is overruled, we merely consider this exhibit for what it shows on its face.
[14] Applicant's objection first presented in its appendix that this information was not produced during discovery is overruled.

[15] Applicant's objections to these exhibits are overruled.

Springsteen purchased one in the late 80s. Both musicians perform with these guitars. Sadowsky Test. pp. 41, 42. See also Exh. Nos. O-27 and 28 (picture of Simon and Springsteen playing Madison Square Garden in 1986 with Sadowsky guitars in 126 shape).

All Three Body Configurations

Michael Tobias testified that many manufacturers were making guitars in the three shapes. Tobias Test. p. 23-24.

> ...by the mid '70s the Japanese invasion of instruments was huge and there were lots of brands making these shapes all for sale and in the same place at the same time. There were American builders also being like Schecter who opened Schecter Shops which we actually participated in '78 where they would just stock you with these bodies and necks of almost an exact spec with their name on them and their whole business was to assemble parts guitars for people.

Tobias Test. p. 11.

Many manufacturers sold guitar kits with these body shapes from the mid-70s where the customer assembled the guitar. Sadowsky Test. pp. 98-105, see also Exh. Nos. O-60 and 62.[16]

Hartley Peavey, owner of opposer Peavey Electronics Corporation, testified:

> A. They have become traditional shapes over the last 50 years and these shapes are made by hundreds, maybe thousands of companies.
> Q. And how would you know that?

---

[16] Applicant's objections to the exhibits are overruled.

A.  Simply because I have been in the industry
longer than anybody else that I know in the
industry....
Q.  And you have seen them for sale in the United
States?
A.  Yes, I went to my first trade show in 1954.
NAMM[17] show, I'm sorry, not trade show.

Peavey pp. 74-75.

Douglas Abrams, owner of opposer IndoorStorm,

testified:

Q.  What kind of shapes are indicated on your
website?
A.  If you go to our website you would see many,
many shapes of what is called the Stratocaster,
Telecaster and the Precision bass.  You would
certainly see on the Stratocaster, if you had been
to IndoorStorm since we started, you would be in
the thousands of different guitars that we posted,
that [126], entitled the Stratocaster, all of the
shapes, virtually identical.

Abrams Test. p. 19.

...based on the data that we have, that there are
about two to three million separate IP addresses
that on a typical year, who hit our website.

Abrams Test. p. 128.

...when I went to the NAMM shows not only have I
seen these generic shapes ... but there are walls
of them...There are brands from Hondo, JB Player.
You could walk into any – within one foot of
walking in, if you just circle, you would see at
least three or four thousand of these generic
shapes.

Abrams Test. pp. 21-22.

Based on my years and years of looking at guitars
and selling guitars and reading guitar magazines,
I'm convinced this body shape here [126],
Stratocaster, has absolutely no connection with

---

[17] NAMM, the National Association of Music Merchants, is the major industry trade show.  Sadowsky Test. p. 19.

any one manufacturer on this planet. The same with [928], this generic body shape has absolutely not one bit to do with any one manufacturer on the planet... the Precision bass [127] has absolutely nothing to do with any specific manufacturer on the planet. And you could look at these and have no clue whose guitar it would turn out to be.

Abrams Test. pp. 34-35.[18]

...there is no way that these drawings have any degree of uniqueness that gives Fender some claim to the use of those body shapes. And if somebody said are there thousands of guitars that have body shapes that fall within the category of great similarity to these three shapes, I would say there are about as many of these as there are stars.

Abrams Test. pp. 100-101.

Kenneth Warmoth, partner of opposer Warmoth Guitar Products, Inc., has sold component parts of guitars including guitar bodies since 1976. Warmoth Test. p. 9. He has sold to major retailers, including Sam Ash, Music Arts Enterprises, Book Mays and thousands of other retailers. Id. Beginning in 1976, he traced the bodies of applicant's guitars as depicted in 126, 928 and 127 to make his identical product. Warmoth Test. p. 12. His company has manufactured all three body shapes since 1976 and continues to do so. Warmoth Test. p. 42. He testified he has seen these body shapes continuously in magazines, music stores, and trade shows made by third parties, including Aria,

---

[18] Applicant's objections are overruled, the witness is merely presenting his opinion based on his years of working in this industry, in the same manner applicant's retailer witness (Umanov) presents his opinion.

25

Hondo, Ibanez, Schecter, DiMarzio and Tom Anderson. Warmoth Test. p. 19. Consumers have been exposed to Warmoth guitars in advertising since 1976, through catalogs since 1978 and on its website since 1997. Warmoth Test. p. 25.

> What launched our impetus into this market was a demand for higher quality parts, for different woods, for different woods and finishes that were not available from Fender. And the body is very comfortable, it's very ergonomic, and that's what makes it popular, in my opinion, and there's just a huge demand for it. It's the same body that everybody uses. It's pretty universal and common.
> Q. When you say "universal," can you elaborate on that?
> A. By "universal" I mean it's – so many manufacturers have used this shape, that it's "the" body...It typifies the American guitar, Strat.
> Q. In terms of one manufacturer?
> A. I would say most. Double cutaway Stratocaster body is by far the most popular body out there.
> Q. And popular in terms of all manufacturers?
> A. I would say.

Warmoth Test. p. 32, see also, Exh. Nos. O-394-397 (Warmoth catalogs from 1982 on).

Thomas Anderson, president of opposer Tom Anderson Guitarworks testified as follows:

> Q. When you refer to this shape [126], is this shape referred to in a sense of a genre or with some specificity as to one manufacturer?
> A. No, it's a style that every manufacturer I can think of makes.

Anderson Test. p. 12.

Mr. Anderson provides the same testimony as to the 127 and 928 shapes. Anderson Test. pp. 13-14, see also Exh. Nos. O-357-371 (advertisements in various consumer and trade

magazines showing Anderson guitars in 126 and 928 shape from 1986-2000).  Both Anderson and Schecter traced Fender guitar bodies (126, 928 and 127) to make their guitars.  Anderson Test. pp. 15-18, 72.  During his tenure at Schecter from 1976-1984, Anderson testifies that Schecter made identically shaped guitars.  Anderson Test. p. 15.  He saw guitars identical to 126, 928 and 127 advertised by third parties in Guitar Player magazine from 1972 on and saw identically shaped guitars in stores from 1970 on.  Anderson Test. p. 21.  Anderson's 126 shaped guitar was featured on the television animated series "The Simpsons."  Anderson Test. p. 57, Exh. No. O-382.[19]

Richard Keldsen, owner of opposer Saga Musical Instruments, testified that he has sold guitar kits that include bodies in the 126 and 127 shapes since 1978 and the 928 shape since 1980 (with a hiatus for approximately 12 years from the mid-eighties to nineties).  Keldsen Test. pp. 20, 23 and 26.  He advertises in music magazines, trade publications and consumer-oriented magazines, and exhibits at NAMM trade shows.  Keldsen Test. p. 10.  He began advertising in Guitar Player magazine beginning in 1978-79 and has advertised in the same magazines as applicant. Keldsen Test. pp. 13-14.  As to other manufacturers he testifies as follows:

---

[19] Applicant's objection to this exhibit is overruled.

27

Q. Do you know any of the manufacturers that produce body shapes that are depicted here in Opposers' O-107, 108 and 109 [126, 928 and 127 shapes]?
A. There are a lot of them.
Q. When did you first see the body shapes in terms of other manufacturers that are depicted in [126, 928 and 127]?
A. It probably goes back to the days before I was even involved as a participant in the musical instrument industry. There were guitars being sold, you know – I started in the early 1970s, and right from the get-go there were numerous manufacturers that had – that were using those body shapes...You'd see them in the music stores you'd go in. And, you know, they were pretty much omnipresent.

Keldsen Test. p. 29.

Other manufacturers include Tokai, Hondo, and Yamaha.

Keldsen Test. p. 35.

Matt Masciandaro, president of opposer ESP Guitar

Company testified:

...Well, this [126] is a generic shape that is made by every solid body guitar manufacturer in the past 50 years, including ESP. And we've been making it for 20 years in the United States.

Masc. Test. p. 12.

...The people we deal with and our customers have grown up in a market where these shapes have been made by every manufacturer that they see, whether it's in a store or on a stage, all making a similar shape to this... Every company makes it.

Masc. Test. p. 26.[20]

Because Fender is applying for a mark on bodies that have been used by many manufacturers other than Fender for a period of 50 years and are now generic shapes not necessarily associated with a

---

[20] Applicant's objections to this testimony are overruled.

28

> specific brand, so I don't think they have the position to do that or to receive that mark.

Masc. Test. pp. 40-41.

ESP's Vintage Plus and GL-56 models are identical to the 126 shape. Masc. Test. p. 15. Their Ron Wood model is identical to the 928 shape and has been made since 1989. Masc. Test. p. 17. The P-4 and the P-5 model basses are identical to the 127 shape. Masc. Test. p. 20. ESP displays its guitars in magazines, catalogs and on its website. See Exh. Nos. O-346 (catalog from early 90s with 126 and 928 shaped guitars); O-347 (catalog from 1995 with 126 and 928 shaped guitars); O-354 (catalog from 2004 with 126, 928 and 127 shaped guitars). Their guitars are sold in retail establishments including Sam Ash and Musician's Friend. Masc. Test. p. 6.

John Suhr, president of opposer JS Technologies, testified that when he was working at a music store called Rudy's Music Stop in 1982 he assembled and sold Schecter guitar kits that had the body shapes of 126, 928 and 127. Suhr Test. p. 7. Since 1997, Suhr has made guitars with 126 and 928 shaped bodies. Suhr Test. pp. 23-24.

Gary Levinson, founder and president of Levinson Limited, testifies that he makes guitars in the shapes in 126, 928 and others have made these shapes since the 60s, including Hofner, Aria, Ibanez, Riverhead, Moon, Fernandes,

29

Tokai, Hondo, Samick, Washburn, Peavey, Schecter, ESP, Hamer, and Pensa-Suhr.  Levinson Test. pp. 14-15.

Michael Ciravolo, president of opposer Schecter Guitar Research, testified as follows:

> Q.  Do you know if any of those competitors manufacture guitars that have body shapes that are similar to what we are showing you here in [126, 928 and 127]?
> A.  I think you'd be hard pressed to find one that doesn't.
> Q.  Do you know when any of these competitors of yours may have begun to make those body shapes?
> A.  That would be a guesstimate on my part.  But I know from my beginning retail days, pretty much everything that I said that we stocked is based, you know, on this or a slight variation.[21]
> Q.  And that began in what year.
> A.  '80, pretty much, at the Music Stop.  That would put me at '70 or '80. ...
> Q.  Do you see any of your competitors showing guitar shapes that are embodied here in [126, 928 and 127] in any of the consumer or trade magazines.
> A.  Oh, all of them.

Ciravolo Test. pp. 17-19.

> A.  Why after 60 years would I be asked to change a body style?  We've been making this for a long time.  There are tens of thousands of guitars that are identical to that on the market.  I'm not changing my guitar design ...They want a Schecter guitar.  They want a Schecter C-1 that Jerry Horton from Papa Roach plays.  They want a Schecter C7 that Jeff Loomis plays.

Ciravolo Test. p. 99.

Mr. Ciravolo testified that in the beginning Schecter sold parts to custom shops and stores that would assemble them for customers which looked "pretty generic ...just

---

[21] Applicant's objection to this answer is overruled.

mainly what you have here, the Strat, Tele you know, with the guitars." Ciravolo Test. p. 29. See also Exh. Nos. O-168 (2004 catalog with guitars in 126, 127 and 928 body shapes); O-170 (2006 30 year anniversary catalog with many 126, 928 and 127 shaped guitars). Schecter advertises in magazines, including Guitar Player, Guitar World, Revolver monthly and catalogs. See generally Ciravolo Test.

Harold Kuffner is a "source liaison for helping people find factories to manufacture guitars, basses, acoustic guitars, mandolins, banjos" and has worked in the musical instrument business for 39 years. Kuffner Test. pp. 3-4. As such, he is competent to testify as to the manufacturing and importing of guitars into the United States and his business relationships with some of the opposers does not fatally bias his testimony on this issue. He testified that during the 1980s factories in Japan manufactured and imported into the United States the same or similar guitars for applicant and its competitors Ibanez, Yamaha, Moon Custom Guitars, Tokai and Fernandes. Kuffner Dep. pp. 14-15, 46.

A few examples of some of opposers' guitars from testimony exhibits are set forth below.

  



 

[22] Sadowsky Test. O-30 (page from Bass Player magazine).
[23] Sadowsky Test. O-34 (page from Guitar World magazine).
[24] Sadowsky Test. O-45 (page from Guitar Player magazine).
[25] Sadowsky Test. O-46 (page from Sadowsky website)
[26] Lakin Test. O-75 (2002/2003 Lakland catalog).
[27] Lakin Test. O-85 (page from Bass Player magazine).



28



29



30

---

[28] Warmoth Test. Exh. O-396 (1985 Warmoth catalogue).
[29] Warmoth Test. Exh. O-402 (1991 Warmoth catalogue).
[30] Masc. Test. Exh. O-347 (1995 ESP catalog).





---

[31] Masc. Test. O-354 (2004 ESP catalog).
[32] Ciravolo Test. O-168 (2004 Schecter catalog).
[33] Suhr Test. O-339 (excerpt from Suhr website)
[34] Suhr Test. O-342 (excerpt from Suhr website).



In addition, opposers' notices of reliance are replete with excerpts from consumer magazines over a thirty year period dating from 1975 - 2007 that contain advertisements for, or articles about, third-party guitars that are identical in shape to 126, 928, and 127.  A few examples are reproduced below.

---

[35] Masc. Test. Exh. No. O-355 (2006 catalog).
[36] Masc. Test. Exh. No. O-356 (2007 catalog).



Exhibit No. O-517, which does not reproduce well from the electronic database, contains a full page advertisement

from the November 1981 Guitar Player magazine that has a picture of a store with opposer Schecter's guitars on display which are identical in body configuration to 126, 928 and 127. Exhibit No. O-594 is a full page advertisement from the September 2004 Vintage Guitar magazine that displays opposer Anderson's guitars in the 126 and 928 body shapes next applicant's guitars in the 126 and 928 body shapes. Applicant does not dispute that it advertises in the same magazines, e.g., Guitar World and Guitar Player, as opposers. McDonald Test. p. 163.[37]

A few examples of guitars that applicant may not consider to be identical are reproduced below.

---

[37] Richard McDonald, applicant's senior vice president of global marketing.



O-504       O-510

O-538       O-547

Failure to Police

The record also shows that applicant was aware of opposers' products and never objected to the body shapes, although, in some cases applicant did object to their headstock designs.

    Q.  Have you ever received any correspondence from Fender or its predecessors in interest regarding the use of the P bass body shape?
    A.  No.  Not regarding the use of the P bass body shape.  We did have a headstock issue when we first started.  We had only made one bass, photographed it, it was in an ad and they thought it was too close to theirs.  And we settled that.
    Q.  You changed that?
    A.  Changed it.
    Q.  Nothing to do with the body shape.

A.  Nothing ever, no.

Lakin Test. p. 44.

Q.  There's no doubt that you had an authentic
Fender Precision bass and you copied the outline
of that body style.
A.  Yes.  We did.
Q.  And that's what Mr. Glaub wanted you to do.
A.  That's correct, yes.

Lakin Test. p. 78.

Sadowsky testified that he has a "P Bass shaped" instrument advertised on the website and has not received correspondence from applicant or its predecessors.  Sadowsky Test. p. 69, Exh. Nos. O-30, 38 and 40.  The majority of its instruments are in one of the shapes as depicted in 126, 928 and 127 and he never received correspondence from applicant. Sadowsky Test. p. 18, see also p. 33.

Tobias testified that he never received an objection from applicant.  Tobias Test. p. 12.  Hartley Peavey, owner of opposer, Peavey Electronics Corp., testified he never received correspondence from applicant to cease making his body shapes.  Peavey Test. p. 31.[38]

Kenneth Warmoth testified he never received correspondence from applicant regarding his body shapes but

---

[38] While Peavey testified that many of his instruments look like 126, 928 and 127 in body shape, in cross examination Peavey states that the body shapes of his guitars have differences from applicant's (e.g., sharper horns).  This testimony does not obviate the obvious similarities in some of the shapes or clarify how they would be perceived by the general consuming public.

did receive a complaint about his headstock and now they license that use. Warmoth Test. p. 30.

> Q. And you have a licensing agreement to manufacture what from Fender?
> A. Replacement necks utilizing the Fender trademark head shape.
> Q. In those discussions utilizing that license, was there any conversation or written documentation with reference to body shapes?
> A. No.
> Q. Would your company be harmed if you're no longer able to make body shapes depicted in [126, 928 and 127]?
> A. It would have a significant impact on our sales numbers and value [sic] of employees.
> Q. Why are you an opposer in this proceeding?
> A. I've been making these body shapes for 30 years, unopposed, untrademarked, and have built a business on making these parts. There's a lot of demand for it. While I make other body shapes, the demand for them is pretty insignificant when compared to these three shapes.

Warmoth Test. p. 31.

Douglas Abrams testified that IndoorStorm has sold many brands, including applicant's as an authorized dealer, and applicant never objected to its selling of guitars made by others with identical body shapes. Abrams Test. p. 58.

Tom Anderson testified that his company has been displaying its 126 and 928 shaped bodies at the NAMM trade show (from 1986 on) and representatives from applicant came to his booth. Anderson Test. p. 23, 26. Applicant specifically objected to the shape of his headstocks which he changed to accommodate applicant but never objected to the identically shaped guitar bodies. Anderson Test. p. 35. When asked how his company would be harmed if it could no

40

longer manufacture guitars in the 126 and 928 body shapes he responded, "We couldn't exist." Anderson Test. p. 37.

Mr. Masciandaro testified that ESP displays their Vintage Plus, GL-56, P-4 and P-5 models at NAMM and applicant's representatives have been by the booth. Masc. Test. p. 24. Applicant never objected to the body shapes only to the headstock. Masc. Test. pp. 34-35.

Mr. Levinson testified that he was never contacted by applicant regarding his guitar body shapes but has received correspondence regarding the headstock. Levinson Test. p. 32.

Mr. Keldsen testified that he was contacted as to his use of the term "Stratokit" and later as to his headstock, but never as to the body shapes:

> A. When we first put the kit on the market, we called it the Saga Stratokit. And within 30 seconds of its introduction, we got a letter from Fender's legal staff. And, actually it was a nice letter. And it said, you know, you can't do that. You know, we've got – we have this word trademarked. And that was it – and so we stopped immediately. And just incidentally, there was no – there was no talk about the head stock. Certainly, there was no talk about the body. The head stock didn't become an issue until six or seven years later. And the body never became an issue.

Keldsen Test. p. 73.

Even applicant's witness acknowledged that third parties made guitars with body configurations that were identical to 126 and provided no testimony that any action

41

was taken against those manufacturers.  See, e.g., McDonald Test. pp. 429.  The examples of enforcement efforts proffered by applicant are after 2002 and pertain almost exclusively to internet auction sites.  See generally Holtry Test.

Applicant's Trademark Notice

Applicant's trademark notices have evolved over the years.  What the record establishes is that applicant, starting from the beginning in the 1950s, never claimed the body configurations as trademarks in any advertising or required third parties to do so until 2003, the year it filed its applications.  Moreover, the later trademark notices do not specifically claim the simple outlines of the body configurations by themselves, but rather lay claim to the "body designs."

In an advertisement in the 1972 Down Beat magazine the trademark claim reads "Fender is a registered trade mark of: CBS Musical Instruments A Division of Columbia Broadcasting, Inc."  McDonald Test. Exh. A-154 FMIC009740.  In a 1983 Guitar Player advertisement the trademark claim only references the word mark:  "Squier is a trademark of Fender Musical Instruments."  Id. FMIC009952.  In a 1985 Guitar Player advertisement only the word marks are claimed "Fender, J Bass, Jazz Bass...are trademarks of..."  Id. FMIC009973.

In the sample of trademark claims that include the body designs appearing in publications submitted under Mr. Holtry's testimony, the earliest example is from 2003. Holtry Test. Exh. No. A-218 (May 15, 2003 Rolling Stone magazine "...the distinctive headstock and body designs of such guitars and basses are the trademarks of...").

The most revealing examples come from applicant's own Frontline catalog. Reproduced below are the trademark claims as they evolved over the years.

> 1990 - Fender, Squier, Sunn, Frontline, Stratocaster...and the head profiles of F.M.I.C.'s classic guitars and basses...are all trademarks of FMIC (McDonald Test. Exh. No. A-148 FMIC000005);

> 1997 – Fender, Squier, Frontline, Telecaster...the head profiles of FMIC's classic guitars & basses...are all trademarks of Fender Musical Instrument Corp. (Id. FMIC001217);

> 1999 – Fender, Squier...and the head profiles of FMIC's classic guitars and & basses...are all trademarks of Fender Musical Instrument Corporation (Id. FMIC001694;

> 2001 – Fender, Squier, Guild...and the head profiles...are all trademarks... (Id. FMIC001900);

> 2003 – The trademarks identified in this magazine, including the headstock designs of the Stratocaster and Telecaster guitars are owned by FMIC. (Id. FMIC002162);

> 2004 – The trademarks identified in this magazine, including the Fender Jazz Bass, Precision Bass, Stratocaster and Telecaster guitar body and headstock designs are owned by Fender Musical Instruments Corp. (Id. FMIC002297).

Applicant's omission of its body outlines from its trademark notices cannot be from a lack of understanding the

43

concepts of intellectual property protection.  Over the years, applicant has registered many trademarks.

Recognition of Third-Party Use in Advertising

The copy in applicant's advertisement in a 1981 issue of Guitar Player magazine reads "You can play an original or you can end up with one of the many copies."  McDonald Test. Exh. No. A-154  FMIC009858.  Applicant's advertisement in a 1988 issue of Guitar World reads, "You're not taken in by look-alikes or by wild claims."  Id. FMIC009878.  Another advertisement in the record comes from the August 1986 issue of Guitar Player and reads:

> Nothing can compare to the genius of an original.
> Because even the best copies are only imitations.
> The same is true in music.  Eric Clapton and the
> Fender Stratocaster are probably the most imitated
> guitarist and guitar in the world.  But there's no
> genius in imitation.  Only confirmation of
> something we've known all along.  There's only one
> Eric Clapton.  And only one Fender.

Id. FMIC009786.

The unrebutted testimony in this record indicates that at the time this advertisement ran, applicant did not seek to stop others from producing guitars with the identical body shape.  This advertisement shows a company recognizing that others make this shape and distinguishing its guitar from others by its name - there's "only one Fender."

It is clear from this record that guitar consumers in the United States have been exposed to a multitude of the 126, 928 and 127 body shapes, either as complete guitars or

44

as guitar parts, coming from and being associated with third parties.[39]

The evidence overwhelmingly demonstrates that these configurations are so common in the industry that they cannot identify source. In fact, in the case of the 126 body outline, this configuration is so common that it is depicted as a generic electric guitar in a dictionary. See Random House Dictionary of the English Language Unabridged (2d ed. 1987) definition for the word guitar.[40]

---

[39] Not only were consumers inundated with pictures of these body shapes for sale by others, but many articles were written about various third party guitars with these shapes. See e.g., Guitar Player magazine excerpts. One particular excerpt reads:

> But no design has ever even approached the current dominance of the Strat-style in the contemporary guitar scene. "It's overwhelming," reports Bob Capel, from Sam Ash Music on West 48th Street in New York City, one of the world's leading guitar retailers. "Very few manufacturers don't make one. Kramer's got 'em, Charvel's got 'em, Jackson's got 'em, plus the custom-made instruments. Of the people coming into the store, I'd say at least 70 or 80% want a Strat or Strat-styled guitar." ...Al Julson at Knut-Koupee in Minneapolis: "Every company's got at least one, it seems – Guild, B.C. Rich, Music Man. It's a sign of the times – the contemporary music scene just seems to be using the Strat-style. In the '70s, with the popularity of the Allman Brothers and Jimmy Page and others, the Les Paul was popular, but there weren't nearly as many companies copying it."

Smith Test. Exh. O-2 August 1987 Guitar Player magazine.

While we cannot receive the substance of the article for the truth of the matter, we can accept this as evidence of potential consumers being exposed to these statements.

[40] The Board may take judicial notice of dictionary definitions. University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., 213 USPQ 594, 596 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

In an attempt to rebut opposers' case, applicant argues that many of the guitars in the record are not similar in shape to applicant's body configurations. Applicant relies on its cross examination of opposers' witnesses where they testified to differences in the shapes. While in a few cases the guitars may have differences that may be noticed by general consumers, in many instances the differences were described as follows:

> ...[discussing the C-1 Classic] it looks to me the top horn is slightly longer, the bottom horn is slightly longer. But we're talking such low tolerances. And I guess I'm not just – I'm not used to looking at this guitar two-dimensional outline.
> Q. What about the – when you said the horn was longer, you mean in a direction from the bottom of the guitar up toward the head stock?
> A. The balance point. But we're talking an eighth of an inch, if that.
> Q. What about the width of the horns in comparing the C-1 Classic to what's depicted in [126].
> A. The C-1 Classic is never meant to be a two-dimensional guitar. The horns have a real unique contour. So again, unless I was laying two like templates on top of each other, I can't tell you to be precise.
> Q. So the horns of the C-1 Classic may be narrower than what's depicted in [126], you're just not sure?
> A. We're talking, in guitar terms, you know, if I had calipers, I mean, you're talking fractions, millimeters, if that. And depending where in the horn, does it get thicker as it goes down? I mean, I can't give you an exact answer on that. I've never overlaid it on a Strat template.

Ciravolo Test. pp. 81-82.

Below is Schecter's C-1 guitar, the 126 drawing, and one of applicant's guitars for comparison:

46



Schecter has also sold the traditional model shown below again with the 126 drawing and one of applicant's guitars for comparison:



While the record includes a spectrum of guitars, even looking only at those that are identical, there is sufficient support to establish rampant third-party use over

---

[41] From Holtry Test. Exh. No. 218 Intel advertisement with a Stratocaster [127] body.

the course of over three decades.  Moreover, those guitars
that are close or very similar confirm the lack of
distinctiveness.  It is simply not reasonable to conclude
that the average consumer of guitars, which would include
non-musical parents buying a guitar for their child, could
distinguish one guitar from another based solely on a
millimeter of difference in the body shape.  As the Board
stated in Gibson Guitar Corp., 61 USPQ2d at 1951-52,
"[a]lthough guitar collectors and aficionados may well be
aware of these differences, the determination of acquired
distinctiveness must be made on the basis of casual guitar
purchasers as well [which includes] people who wish to learn
guitar as a hobby, or by parents for their young children.
Such casual purchasers are not likely to note the
differences between applicant's guitar configuration and
those of others, let alone recognize the overall
configuration as a trademark without significant education
on the part of applicant."

Applicant also takes issue with the lack of evidence
regarding the amount of sales of these goods in the United
States;[42] however, the issue is consumer perception which

---

[42] There is some testimony regarding opposers' sales by volume;
however, applicant objected to this testimony on the basis that
it was requested but not provided during discovery.  After a
review of the parties' arguments on this point we overrule the
objections.  It is clear that applicant had been dissatisfied
with opposers' discovery responses, communicated with opposers on
this point, and was told the information requested was not kept

can be addressed by understanding consumer exposure to the goods and the lack of sales numbers is not fatal to opposers' case. Given the decades-long advertising by opposers and third parties as shown in opposers' notices of reliance and testified to by opposers, we may infer that at least a steady stream of sales is occurring over the decades. In addition, the photographs of the 2007 NAMM show reveal a multitude of companies displaying their identically shaped guitars, and for several we have testimony, supra, that the witnesses have seen those types of guitars (in the shape of 126, 928 or 127) sold over the decades in the United States. See, e.g. Kaplan Stip. Aff. Exh. No. O-104 (Aria, Hohner, Fernandes, Samick, Yamaha and of course the opposers ESP, Schecter, JS Technologies, Inc., Anderson Guitarworks). While we do not have sales numbers for those goods in the United States, again we may infer that for those for which we have testimony that they were for sale in the United States in the 70s, 80s and 90s, that they continue to be for sale and that is why they continue to participate in the annual NAMM show.

---

in the manner requested. Applicant could have filed a motion to compel but did not. See The H.D. Lee Co., Inc. v. Maidenform, Inc., 87 USPQ2d 1715 (TTAB 2008). To the extent the testimony is inconsistent with the discovery responses, is speculative or unsupported by documentary evidence, this serves to limit the probative value of that testimony. Finally, while we have overruled the objections, the Board has not relied on this challenged testimony in reaching its decision.

Finally, there is no evidence of record that from the first production of the guitars incorporating these shapes in the early 1950s until 2003, that applicant or its predecessors in interest ever treated the outlines of the body shapes as trademarks. In fact, we may infer from the evidence of record that applicant and its predecessors themselves did not view them as trademarks. They never policed the body shape, only the word marks and headstock profiles. In addition, they never claimed trademark rights in the body outlines publicly through, for example, the catalogues, until 2004. Rather, they only claimed the word marks and the headstock profiles. In the meantime, many other guitar manufacturers sold guitars with the identical body shapes for at least 30 years, either as complete guitars or in the form of kits.

In view of the above, we find that opposers' have proven their claim that the applied-for configurations are generic.

In an attempt to sweep away the inescapable conclusion of genericness, applicant has riddled the testimony with machine-gun fire objections. However, even if we only considered the evidence submitted under opposers' notices of reliance and applicant's evidence, we would come to the same conclusion.

## Acquired Distinctiveness

We next address opposers' claim that, in the event the configurations are not generic, applicant has not satisfied its burden to show acquired distinctiveness.

As discussed above, this record establishes that for at least 30 years consumers have been exposed to guitars manufactured and/or sold by third parties that have body outlines that are identical or substantially similar to each of the applied-for configurations. Thus, opposers have met their initial burden to present prima facie evidence or argument upon which we could reasonably conclude that applicant's mark has not acquired distinctiveness. Yamaha, 6 USPQ2d at 1005. In the face of this rampant exposure to third-party guitars for at least 30 years, applicant attempts to carry its burden to show acquired distinctiveness.

Applicant argues that these shapes have achieved an iconic stature but the issue before us is whether these designs are recognized by consumers as indicating a single source or merely as a type of body design that comes from many sources. Thus, even if the designs are iconic that does not, by itself, lead to the conclusion that they indicate a single source. Applicant relies upon the following to establish that its marks have acquired distinctiveness: a survey, long use, sales volume, advertising expenditures, media exposure, licensing/notice,

51

testimony regarding recognition of the mark, and intentional copying.

After an exhaustive review of the record, we conclude that it does not support a finding of acquired distinctiveness.

Applicant's Survey

Applicant's expert witness, Gabriel M. Gelb of Gelb Consulting Group Inc., performed a survey which is of record.[43]  In rebuttal, opposers presented expert testimony challenging the probative value of applicant's survey.[44]

Mr. Gelb reported that 58%, 50% and 21% of respondents identified the Telecaster [928], Stratocaster [126], and Precision Bass [127] shapes, respectively, and 65%, 64%, and 64% of respondents identified applicant as the manufacturer of guitars known as the Telecaster, Stratocaster and Precision Bass, respectively.

---

[43] Opposers' objections to Mr. Gelb's testimony and to the survey are overruled as they go to the weight of the evidence rather than its admissibility, and we therefore consider the survey for whatever probative value it may have.

[44] Applicant's objections to Mr. Gleason's testimony are overruled.  We find the record establishes that he is sufficiently qualified to serve as a rebuttal expert as to the general methodology and implementation of the survey.  Further, we do not find Mr. Gleason's testimony to be tainted by extreme bias.  This simply goes to the weight to be accorded his testimony.  Finally, while a party has a duty to supplement discovery responses, we see no violation here.  Upon retaining Mr. Gleason for rebuttal testimony, opposers timely supplemented their responses.

The survey was conducted in four different geographic locations in Houston, Texas (Evans Music City and Bellaire Music), Chicago, Illinois (Guitar Center and American Music), Philadelphia, Pennsylvania (Medley Music), and Portland, Oregon (Guitar Center). Gelb Test. Exh. No. A-198. The relevant population was defined as "persons who own or plan to own an electric guitar." The survey was conducted in front of the display windows of six different retail musical instrument stores. Potential participants were selected outside these stores and asked if they own or plan to own an electric guitar and, if so, if they would be willing to participate in a "national survey" for a "national maker of guitars." Respondents were then asked a qualifying question as to their level of guitar-playing skill. Those who answered that they do not play the electric guitar were eliminated. The total qualifying sample consisted of 403 individuals who play the guitar at varying levels. The interviewer then went through the following line of questioning:

> What I'd like to do now is to show you some shapes of guitars, some or all of which you might recognize. I'm going to ask you – for each shape – if it represents a specific guitar or bass guitar. It's OK to say if you don't know. I'm going to ask you if you know the name of each specific guitar shown by its shape. It's OK to say if you don't know. Can you tell me the name or names of that guitar? Why do you believe that shape is a _____ guitar? Can you tell me the company or companies that makes that guitar? Why do you believe that shape is made by _____.

53

Opposers have raised a number of perceived flaws regarding the survey. In particular, opposers point to the failure of applicant to disclose the rules and procedure for coding the raw data making it impossible to assess the reliability of the survey. In addition, opposers contend that the interviews were conducted in circumstances that could have influenced the answers of the respondents and the order of the questions may have been structured to bias the answers of the respondents.

We find that the inability to review either the coding rules and procedures or, more importantly, the verbatim responses, lessens the probative value of the survey report's conclusions. While it may be that many of the responses were "one or two word answers," App. Br. p. 36, such information is helpful, and in some cases quite revealing, in evaluating the overall probative value of the survey results. Moreover, the fact that opposers did not "propound a single document request in these proceedings, much less one that would have encompassed the data underlying the Gelb Survey," App. Br. p. 35, does not obviate the need for the Board to be able to review this information.

In addition, the probative value of the survey is weakened inasmuch as it was conducted with the interviewees facing the display windows of stores selling electric

54

guitars, two of which (Guitar Center stores) are known to carry a significant number of applicant's guitars. Gelb Test. p. 148. We do not know if applicant's guitars and word marks were in the display windows but when asked if that would bias the responses Mr. Gelb answered "what the impact would be of the Fender in the window, assuming there was a Fender in the window, I mean I'm not sure what that would mean." Gelb Test. p. 148. See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 32.171 n. 1 (4th edition updated 2009), citing, Marcalus Mfg. Co. v. Watson, 156 F. Supp. 161, 115 USPQ 232 (D.D.C. 1957), aff'd, 258 F.2d 151, 118 USPQ 7 (D.C. Cir. 1958) (location of secondary meaning survey, where participants could see background design with the word mark, tainted survey).

The probative value of the survey is further weakened by the exclusion of an entire segment of the relevant population, those who own or want to own an electric guitar but do not play. American Basketball Ass'n v. AMF Voit, Inc., 358 F. Supp. 981, 177 USPQ 442 (S.D.N.Y. 1973, aff'd without op., 487 F.2d 1393, 180 USPQ 290 (2d Cir. 1973), cert. denied, 416 US 986, 181 USPQ 685 (1974) (because not all potential purchasers were included, survey accorded limited probative weight).

Opposers also argue that the order of the questions was flawed inasmuch as they "were asked in such an order as to

ask for a brand name before a manufacturer's name [and i]n
this circumstance, where Applicant's brand names (Strat,
Tele and P-Bass) are well advertised registered trademarks,
identification of the brand before the name of the
manufacturer's is a critical error, as it suggests an answer
[and] any such bias could easily been disproven by simply
reordering the questions and comparing responses."  Br. p.
55.

Applicant responds that the questions were ordered in
this manner "to address a common consumer perception issue,
which is that many consumers think about and know of
products by their brand name, and sometimes not necessarily
by the manufacturer" and the reliability of the survey "is
confirmed by the fact that most participants know both an
FMIC brand name and named 'Fender' as the single source for
the FMIC Marks."  Br. p. 35.  Further, applicant argues that
in order to "ensure a further level of reliability and to
verify the participant's rationale for identifying a single
source of the configuration" the survey included the follow
up question "why" to see if the respondents have "a complete
understanding of why they have that specific answer."  Id.

In this case, while we do not find the ordering of the
questions to have fatally tainted the responses, the
reliability of the survey would have been increased if the
questions had been reordered.  For example, after answering

56

the question as to the "name" of the shape, when asked why a respondent thought the shape came from a particular company the top reason given for the 928 Telecaster shape was "Fender makes Squier/Telecaster/Jaguar." Exh. No. A-198. This could indicate that asking for the "name" first influenced the response to the "company" question. This could be particularly true here where applicant's products have a large market share and its brand names may have been in front of the interviewees.

We further note other more subtle biases in the survey presentation. For example, during testimony Mr. Gelb was asked whether "by saying national maker of guitars" he was biasing the respondents into thinking about only large guitar companies. He answered as follows:

> Well, I don't know how to answer that because anybody who has a website and offers guitars, whether or not they have one location or fifty locations is a national maker of guitars, as far as I'm concerned. And I think that's a pretty – that's a pretty clear question. If I had not said national, I probably really would have gotten a bunch of local guitar makers who don't sell outside of Houston, and that would not have been productive.

Gelb. Test. p. 132.

In addition, the questions prompt the respondents that these are "recognizable" shapes and ask for a "specific" shape. When asking the next question, which company or companies manufacture this guitar, after the respondent answered with one name they did not ask a follow up question

57

if the respondent knew of any other companies that make guitars with this shape. When asked about this Mr. Gelb testified that it is implicit in the question when asking "company or companies." Gelb Test. p. 143. However, given applicant's market share, it "is not surprising" that interviewees could recall that applicant makes guitars with these body shapes "in light of applicant's sales and advertising, its market share and the length of time that it has sold" guitars.[45] British Seagull Ltd. v. Brunswick Corp., 28 USPQ2d 1197, 1201-03 (TTAB 1993), aff'd 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994), cert. denied, 514 US

---

[45] This problem is illustrated by the 32% false positive responses as to the imaginary shape. Thirty-two percent of respondents believed an imaginary shape came from applicant. Gelb Test. Exh. No. A-198. Thus, when we subtract the positive results of the control shape from the positive results on the target shapes the results are much lower, 32 and 33 percent. We note that Mr. Gelb did not view these results as a problem:

> So the fact that when you have something that you
> can't really see what the configuration is and you in
> some proportion ascribe it to the market share leader,
> I don't think that's strange...And that when
> confronted with a strange shape, some proportion said
> that was Fender. I don't find that's strange, nor
> does it controvert the other findings that I've
> described...and secondary meaning surveys, you are
> looking just for the facts as the respondents know
> them, and there is no reason to subtract anything from
> what are the perceived facts.

Gelb Test. pp. 160-61, 162, 164.

Mr. Gelb's conclusory statement does not provide sufficient explanation as to why these false positives do not serve to impact the other results. Applicant's explanation that the imaginary shape applicant provided actually resembles applicant's other guitars, frankly, merely serves to confuse the issue even further rather than clarify or explain away these false positives.

1050 (1995). Thus, the questions "name or names" and "company or companies" allowed respondents to "just play back the [name] of the best-known and dominant [brand]." McCarthy, supra § 32.172.[46]

In support of its position that the survey is highly probative of acquired distinctiveness, applicant relies on In re Owens-Corning Fiberglas Corp., 227 USPQ at 424 (survey showing 41% and 50% recognition, submitted together, found sufficient to establish acquired distinctiveness of trade dress) and In re Jockey Int., Inc., 192 USPQ 579, 581 (TTAB 1976) (survey showing 51.6% recognition found sufficient to establish acquired distinctiveness for trade dress). The records in these cases did not include over 30 years of rampant diluting third-party use. In addition, in Owens-Corning the court stated "The Solicitor further criticized the survey on the basis that the way the question was

---

[46] On this point, we note that a more useful survey in this case might have been one that follows the Teflon format where interviewees are first instructed on the differences between matter that is generic and matter that is source-identifying. E. I. Du Pont de Nemours & Co. v. Yoshida International, Inc., 393 F. Supp. 502, 185 USPQ 597 (E.D.N.Y. 1975); McCarthy § 12:16. In such a survey, the control shapes would include actual generic shapes and the question would inquire whether that is a shape that comes from one company or one that comes from more than one company. While we recognize that the Teflon survey is directed at the question of genericness, and applicant here is relying on the survey to establish acquired distinctiveness, given the market share and the fact that genericness is a claim in this case, the Teflon format might have served to answer the lingering question, are respondents recognizing a brand or are applicant and its Stratocaster, Telecaster and Precision Bass guitars, simply dominant in the marketplace.

presented inhibited plural responses from persons who might have believed that more than one manufacturer makes 'pink' insulation.  We do not agree that such criticism requires outright rejection of survey data showing that 50% of the respondents named OCF, the only manufacturer to color its insulation pink.  **Whether or not this survey alone is conclusive**, the results show a syndetic relationship between the color 'pink' and Owens-Corning Fiberglas in the minds of a significant part of the purchasing public."  Id. at 424 (emphasis added).  Given the record in this case, at most this survey may indicate that a certain percentage of the respondents associate these shapes historically with applicant or applicant is the most well known manufacturer but not that the shapes connote single source.

Accordingly, we conclude that applicant's survey is not particularly probative of acquired distinctiveness and does not overcome the high bar set by the lack of exclusive use for decades.

Length of Use

While long use of a mark is a relevant factor to consider in determining whether a mark has acquired distinctiveness, In re Uncle Sam Chemical Co., Inc., 229 USPQ 233 (TTAB 1986), it is not necessarily conclusive or persuasive, In re Packaging Specialists, Inc., 221 USPQ 917, 920 (TTAB 1984).  In this case, while there has been over 50

60

years of continuous use for each of the configurations, the probative value of this factor is greatly diminished inasmuch as this use was not substantially exclusive given the third-party uses.

## Sales Volume/Advertising Expenditures

Applicant has submitted evidence sufficient to establish substantial sales and market share over the years and extensive expenditures on advertising. However, while sales volume figures may demonstrate the growing popularity of the products, mere figures demonstrating successful product sales are not probative of purchaser recognition of a configuration as an indication of source. See Braun Inc. v. Dynamics Corp., 975 F.2d 815, 24 USPQ2d 1121, 1133 (Fed. Cir. 1992) ("[L]arge consumer demand for Braun's blender does not permit a finding the public necessarily associated the blender design with Braun."); In re Bongrain Int'l (American) Corp., 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990) (growth in sales may be indicative of popularity of product itself rather than recognition as denoting origin). Moreover, it is well established that compelling sales and advertising figures do not always amount to a finding of acquired distinctiveness. See In re Boston Beer Co. L.P., 198 F.3d 1370, 53 USPQ2d 1056 (Fed. Cir. 1999) ($85,000,000 in annual sales revenues and $2,000,000 in advertising expenditures found insufficient to establish

acquired distinctiveness); Goodyear Tire & Rubber Co. v. Interco Tire Corp., 49 USPQ2d 1705 (TTAB 1998) ($56,000,000 sales revenues and 740,000 tires sold insufficient to show acquired distinctiveness of tire tread design).

Thus, although there have been substantial sales and expenditures on advertising, the more important question is how is the alleged mark being used, i.e., in what manner have consumers been exposed to the alleged mark so that we can impute consumer association between the configurations and the product producer. To determine whether a configuration has acquired distinctiveness, advertisements must show promotion of the configuration as a trademark.

Here, other than trademark notices on advertisements that include the body designs beginning in 2003,[47] there is nothing in the record that shows that the alleged marks are being promoted as source indicators. The examples in the record simply show a picture of the product and in all of the examples the word mark FENDER is prominently displayed.[48]

Applicant's assertion that it promotes the configurations as trademarks by "look for" advertising is

---

[47] Exh. No. A-148. With regard to the trademark notices, see discussion supra.

[48] It is possible that one or two examples without the mark Fender may be in this voluminous record.

not supported by the record.  Mr. McDonald testified as follows:

> Q.  You've used that term a couple of times today, "beauty shot."  What do you mean by that?
> A.  "Beauty shot" is kind of a subgroup of what we call the "moneyshot" on a "look for" type advertising campaign, where we depict our product, you know, the points of differentiation in the best possible light. ...
> Q.  And what portion of the guitar is depicted in that money shot or what did you call it?  Beauty –
> A.  Yeah, "beauty shot" is what we call it.  The body, where the finish and – you know, where our differentiation lies in the shapes of the bodies, the finishes, you know, the ornamental features of the guitar.

McDonald Test. pp. 103-104.

> Advertising is about differentiation.  You don't advertise things that your competitors can lay claim to.  And what is ours are the designs of our instruments, so they feature predominantly in the advertising.  It's basically 'look for' advertising, as you see in just about any industry.

McDonald Test. p.  164.

"Look for" advertising refers to advertising that directs the potential consumer in no uncertain terms to look for a certain feature to know that it is from that source.  It does not refer to advertising that simply includes a picture of the product or touts a feature in a non source-identifying manner.  Below are examples of what Mr. McDonald pointed to as "look for" advertising.



McDonald Test. Exh. A-148 FMIC001705.

This is merely a picture of the goods, not "look for" advertising.



McDonald Test. p. 168, Exh. A-154 FMIC09004.

Again, this advertisement merely presents a picture of the product with the accompanying text, "Today, the shape and sound are familiar.  But back then, they were nothing short of revolutionary."  In other words what is accepted as the normal standard today was viewed as strange and "revolutionary" when it first appeared in the marketplace. Moreover, "[a]dvertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding."  Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 662, 36 USPQ2d 1065, 1071 (7th Cir. 1995); Turtle Wax, Inc. v. First Brands Corp., 781 F. Supp. 1314, 22 USPQ2d 1013, 1022 (N.D. Ill. 1991); In re Edwards Ski Products Inc., 49 USPQ2d 2001 (TTAB 1999); In re Pingel Enterprise, Inc. 46 USPQ2d 1811 (TTAB 1998).  See also First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1 USPQ2d 1779 (9th Cir. 1987) (no acquired distinctiveness found where "It did not, for example, order consumers to look for the 'familiar yellow jug'"); Sykes Laboratory, Inc. v. Kalvin, 610 F. Supp. 849 (C.D. Cal. 1985) (cosmetic container held without acquired distinctiveness because claimant "never promoted its design separate and apart from the trademark name").

 McDonald Test. p. 194, Exh. A-154 FMIC009569.

The advertising copy above this picture reads, "professionals choose a Fender bass more often." It does not direct viewers to look for that body outline to know it comes from applicant. Instead, it prominently displays the Fender trademark in the bottom of the picture to identify the source.

Applicant also points to the 2004 edition of Frontline celebrating the 50th anniversary of the Stratocaster, and particularly notes the pictures of the Stratocaster on pages 2 and 3. However, the main focus is on the head stock, and the following is written next to a picture of only half of the Stratocaster body: "It's the de facto standard. Our literature calls it the most popular electric guitar ever made. When people think of an electric guitar, they think of that shape." McDonald Test. Exh. A-148 FMIC02299. This

66

alludes to at least the outline shape being a "standard" or "generic" shape for an electric guitar.

An advertisement in the August 1986 issue of Guitar Player, that applicant points to as "look for" advertising, again is simply a picture of the product. See, e.g., A-154 FMIC009784-9786. Moreover, as discussed infra the accompanying text in the advertisement acknowledges copies.

Another advertisement in Guitar Player in a 1981 issue includes the following:

> Unfortunately, many guitar and accessory companies have been more concerned with offering you a look-alike. But at Fender, we believe you shouldn't settle for anything less that true Fender sound. And our Fender products are proof of it. So the point of all this is simple. You can play an original or you can end up with one of the many copies. But don't say we didn't warn you.

Exh. A-154 FMIC009858.

Finally, the advertising copy in a 1990 advertisement reads: "We created the Strat Ultra for the working pro-the musician who's been there and back. You're not taken in by look-alikes or by wild claims." Exh. A-154 FMIC009878.

In short, there is nothing in the record that promotes the configurations in a way that would imbue them with source-identifying significance; rather, the advertising simply shows the product like any advertising would. Moreover, in some cases the advertising severely undercuts applicant's position in that it recognizes copies and treats the product as an industry standard.

67

There are cases where the lack of "look for" advertising was not fatal in view of industry practice to recognize certain configurations as source indicators. See Yamaha, 6 USPQ2d 1001 (where the promotional display of product pictures served as a vehicle for stimulant recognition of the head shape designs given the custom in the industry to use headstocks as source identifiers); In re The Black & Decker Corp., 81 USPQ2d 1841, (TTAB 2006) (industry practice to use key head design as source indicator).

The third-party registrations submitted by applicant for guitar body designs (App. NOR) support applicant's position that the United States Patent and Trademark Office recognizes guitar body designs as capable of indicating source and the industry's practice of registering guitar body designs.[49]

In Yamaha, the evidence of record included four other guitar makers that made "similar" headstocks. In addition, the application had been filed in 1979 based on first use in 1977, in other words, there were only two years in which concurrent use could have had dilutive effect. In our case, there has been over thirty years of "an environment of

---

[49] We note, however, that in many of these examples the applications were filed within five years, as opposed to 50 years, of first use, indicating a recognition and intention that the body design should be treated as a trademark.

proliferation" of usage by others of identical body shapes and very similar body shapes. Yamaha, 6 USPQ2d at 933. Further, in Yamaha the Board noted that in fact one of the "competitive" headstocks was a registered trademark and while two of the designs "seem somewhat similar" the two others were "quite distinguishable." Yamaha, 6 USPQ2d at 933 fn. 13. Finally, the Board noted that it was "mindful of the inability of opposer's highly limited evidence to demonstrate such commonality or ornamental significance that an unusually heavy burden would be needed to sustain a Section 2(f) burden of proof." Yamaha, 6 USPQ2d at 935. In the case before us, opposers' evidence cannot be characterized as "limited." Opposers' evidence coupled with applicant's inaction in failing to police other uses of these designs and its omission of these body designs from its trademark assertions in its own magazine (see e.g. the trademark statements in applicant's Frontline magazines from 1990-2003 Exh. A-148) clearly demonstrate such commonality that applicant has an unusually heavy burden in this case. Thus, the absence of "look for" advertising is just one more piece added to an avalanche of evidence that obliterates any claim to source-identifying significance of the two-dimensional outlines. Therefore, applicant's evidence of industry practice, while supportive of its case, cannot overcome thirty years in which many competitors made,

69

displayed and sold to consumers guitars with the identical body shapes.

## Licensing Agreements

Applicant argues that its broad licensing program which spans video games, restaurants, movies and merchandising items, keeps its marks "in sights and minds of consumers on a daily basis." Br p. 15. We begin by noting that, two of the agreements were signed shortly before the filing date of the applications and the remaining were signed thereafter. Further, some of them are redacted in such a manner that it is not possible to know what trademarks specifically are being licensed together in the same agreement. Viewing the goods (mouse pads, luggage tags, lunchboxes and t-shirts) it is reasonable to infer that the agreement includes at a minimum the mark FENDER, because it always appears with the licensed products. See e.g., Exh. A-245. Even the few merchandise products that are just the body outline, include the word mark.

Applicant argues that "[a] number of third party guitar manufacturers recognize the status of the FMIC Marks as highly recognized and valuable icons [and applicant] licenses certain musical instrument manufacturers to employ the [applicant's] marks in connection with the manufacture and sale of electric guitars, or components thereof, including BBE Sound (parent of G&L), DeTemple Guitars, Dewey

Decibel, and All Parts Music Corp." Br. pp. 13-14. First, recognizing these shapes as "highly recognized" and "valuable icons" can simply mean they recognize the product's desirability not that they identify a single source. In fact, these licensees market their goods under their own trademarks. Further, based on this record, four manufacturers is not a particularly representative or impressive number for this industry. This proceeding alone has 17 guitar manufacturer/sellers opposing registration of these proposed marks.

Media Exposure

Applicant's guitars, in particular the guitar encompassing the 126 body configuration, have been played by many musicians on television and in live concerts. However, opposers' guitars encompassing these shapes have also received this type of media coverage. (MTV and The Simpsons). See, e.g., Anderson Test. p. 57 Exh. No. O-358. Moreover, these exposures are of the entire guitar. There is nothing to single out the body outlines by themselves. Similarly, the examples of exposure through third-parties' permitted or licensed use in various media, including television, live performances, movies, charitable events and merchandising does not direct the attention of potential consumers to identify the outline of the body configurations as an indication of commercial source. With regard to the

books written about applicant's guitars, it is not known what exposure these book have had to the consuming public. Gibson, 61 USPQ2d 1948.

### Direct Consumer Testimony

Direct consumer testimony can be relevant to establish acquired distinctiveness. Applicant submitted as "direct consumer testimony" a retailer of applicant's guitars (Umanov testimony), the author of a book about Fender and curator of the exhibition entitled "Five Decades of Fender. The Sound Heard Around the World" at the Fullerton[50] Museum Center (Smith testimony), and one professional musician (Lofgren testimony). This testimony has little probative value as it comes from only three witnesses and does not represent the average customer for guitars. "It is well settled that the assertions of retailers, who know full well from whom they are buying, that they themselves recognize a particular designation as a trademark, or that they believe that their customers consider it to be a mark, cannot serve to establish that members of the purchasing public, who come to the marketplace without such specialized knowledge, would in fact recognize the designation as an indication of origin." In re Semel, 189 USPQ 285, 288 (TTAB 1975). See

---

[50] Fullerton, California is where Leo Fender, the creator of the Stratocaster, Telecaster and Precision Bass, had his manufacturing operations. See generally Smith Test.

72

also In re Edward Ski Products Inc., 49 UPSQ2d 2001 (TTAB 1999).

Intentional Copying

Applicant concedes to third-party use of these body configurations over the years and seeks to use the third-party use as support for the alleged source-identifying significance of its configurations. However, "[c]opying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's." Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 36 USPQ2d 1065, 1072 (7th Cir. 1995). See also In re Edward Ski Products, 49 USPQ2d at 2005. This record supports quite the opposite. All examples of opposers and third-party use clearly display the manufacturer's trademark or trade name on the guitar. Thus, it does not appear that opposers and third parties intended to copy applicant's guitar shapes for the purpose of confusing consumers and passing off applicant's guitar shapes as their own.

Applicant argues that "many opposers utilize well-known FMIC word marks, or similar variations, in connection with [the] sale of their guitar copies, thus causing confusion and taking advantage of the goodwill FMIC has established in the FMIC Marks and its corresponding word marks." Br. p. 47. However, none of these uses serve to confuse the source of the product but rather these uses serve to describe the

73

shape or style of the product.[51]  See, e.g., Sadowsky Test. Exh. No. O-20 (printout from web page describing various Sadowsky guitars as "Strat style").  Moreover, this clearly is not a case where applicant "vigorously pursued manufacture of knockoff goods in an effort to protect its mark."  Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc., 219 F.3d 104, 55 USPQ2d 1360, 1365 (2d Cir. 2000).

While it may be that the more knowledgeable consumers (professional musicians, authors or retailers) are familiar with the history and origin of these shapes, i.e., Leo Fender, based on the multitude of third-party sources for these body outlines and applicant's failure to promote or police these outlines as trademarks, this record does not support a finding that consumers with varying degrees of knowledge would or could identify the source of a particular guitar based solely on the outline of these body configurations.

As noted above, applicant refers to the "iconic" status of these outlines in American popular culture; however, we must resolve a narrow issue:  Do consumers associate these two-dimensional outlines, depicted in the drawings, as indicators of source?  After a thorough review of this

---

[51] The appropriateness of using applicant's word marks in a descriptive manner is not at issue in this case; however, we note the record includes examples of this type of descriptive use in print and on the internet.

extensive record, we conclude that applicant has not established acquired distinctiveness such that these two-dimensional outlines of guitar bodies, standing alone, serve to indicate source.

Accordingly, based upon consideration of all the evidence in the record, we find that opposers have made a prima facie case that applicant's evidence of acquired distinctiveness is inadequate and that applicant has failed to establish that the configurations involved in the applications before us have acquired distinctiveness within the meaning of Section 2(f).

**Decision**: Each of the consolidated oppositions is sustained against the application(s) against which they were brought based on the claim of genericness and in the alternative that the configurations have not acquired distinctiveness; and application Serial Nos. 76516126, 76516127 and 76515928 are refused registration.